# United States Court of Appeals for the Federal Circuit

04-5050

ROBERT K. MURAKAMI,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

John Ota, Minami, Lew & Tamaki LLP, of San Francisco, California, argued for plaintiff-appellant.

Steven J. Abelson, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director. Of counsel on the brief was Tink D. Cooper, Attorney, Civil Rights Division, United States Department of Justice, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Francis M. Allegra

# United States Court of Appeals for the Federal Circuit

04-5050


ROBERT K. MURAKAMI,

Plaintiff-Appellant,


v.


UNITED STATES,

Defendant-Appellee.


_____

DECIDED:  February 23, 2005
_____

Before MICHEL[*], Chief Judge, MAYER[†], and LINN, Circuit Judges.

LINN, Circuit Judge.

Robert K. Murakami ("Murakami") appeals from the decisions of the Court of Federal Claims granting the United States' motion for judgment on the administrative record and denying Murakami's claim for compensation against the United States ("Government") under the Civil Liberties Act of 1988 ("the Act").  See Murakami v. United States, 46 Fed. Cl. 731 (2000) ("Murakami II"); Murakami v. United States, 52 Fed. Cl. 232 (2002) ("Murakami III"); Murakami v. United States, 58 Fed. Cl. 347 (2003)

_____

[*]    Paul R. Michel assumed the position of Chief Judge on December 25, 2004.

[†]    Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004.

("Murakami IV").  Because the Court of Federal Claims correctly determined that Murakami was not entitled to compensation under the Act, we affirm.

## I.  BACKGROUND

This case arises in the factual context of the internment of persons of Japanese ancestry during World War II.  On February 19, 1942, President Roosevelt signed Executive Order 9066, which authorized military commanders to establish prohibited military zones in the United States and to exclude certain entire classes of citizens and aliens from these zones.  Ultimately, Japanese Americans became the only subjects of the mass exclusion, relocation, and detention authorized under Executive Order 9066, even though no documented acts of espionage, sabotage, or fifth column activity committed by Japanese Americans were ever established.

On December 17, 1944, the United States rescinded the mass exclusion ordered under Executive Order 9066.  See Public Proclamation No. 21, Persons of Japanese Ancestry Exemption From Exclusion Orders, 10 Fed. Reg. 53 (Dec. 17, 1944) ("Proclamation No. 21").  Proclamation No. 21 became effective on January 20, 1945.  However, the United States issued individual exclusion orders that excluded individual Japanese Americans from the West Coast for additional time periods.

Murakami's father, Noboru Arthur Murakami ("Arthur Murakami"), was a United States citizen born and raised in Los Angeles and nearby Terminal Island, California.  In 1942, he and his family were relocated by the Government to the Manzanar internment camp in the desert near Bishop, California pursuant to Executive Order 9066.  Around July 1944, the Government permitted Arthur Murakami to move to Chicago, but prohibited him from returning to the West Coast.  In 1944, Arthur Murakami married

Aiko Tani, who was also from Los Angeles. In late 1944, Aiko Murakami became pregnant.

Around February 10, 1945, Arthur Murakami received an individual exclusion order prohibiting him personally from returning to the West Coast. In a letter dated July 21, 1945 from the U.S. Headquarters Western Defense Command, Arthur Murakami's individual exclusion order was lifted when he was informed that he was "now authorized to travel and reside within the West Coast Exclusion Zone." At that time, Aiko Murakami was eight months pregnant. Murakami was born in Chicago approximately one month later, on August 23, 1945. Murakami's family moved from Chicago to Los Angeles approximately ten years later, in June or July 1955.

In October 1996, Murakami filed a claim form for a redress payment under the Act with the Department of Justice ("Justice Department"), Civil Rights Division, Office of Redress Administration ("Redress Office"). In a letter dated July 26, 1997, the Redress Office advised Murakami that he was not eligible for compensation under the Act. In September 1997, Murakami submitted a statement with attached documents stating that his father was subject to an individual exclusion order, which was rescinded "far too late for [his] parents to return to the West Coast" in time for his birth. On March 25, 1998, the Justice Department issued a decision denying Murakami's claim, concluding that on the date of Murakami's birth, neither Murakami nor Arthur Murakami was subject to any legal restrictions preventing their return to Los Angeles.

In February 1999, Murakami filed a complaint with the Court of Federal Claims, appealing the decision of the Justice Department affirming the Redress Office's denial of his requested redress payment. Murakami II, 46 Fed. Cl. at 734. After the

Government filed the administrative record with the court, Murakami filed a motion requesting leave of the court to supplement the administrative record with certain documents, and requesting the court to take judicial notice of the documents submitted. On May 31, 2000, the Court of Federal Claims denied Murakami's motion to supplement the administrative record and declined to take judicial notice of the documents. Id. at 736-40.

On April 2, 2002, the Court of Federal Claims issued a decision upon Murakami's motion for judgment upon the administrative record and the Government's cross-motion. The court dismissed several of Murakami's arguments, Murakami III, 52 Fed. Cl. at 236-37, but remanded the case to the Redress Office "to consider fully whether Mr. Murakami was 'otherwise deprived of liberty' within the meaning of the Act," id. at 242.

On remand, the Justice Department reconsidered Murakami's claim and concluded that Murakami was still not entitled to a redress payment. After the Justice Department's decision, Murakami and the Government again filed motions for judgment on the administrative record. On October 31, 2003, the Court of Federal Claims granted the Government's motion. Murakami IV, 58 Fed. Cl. at 347. The court noted that on remand the Redress Office "appeared to don blinders to much of what this court previously held." Id. at 349. However, the court affirmed the underlying decision of the Redress Office that "Mrs. Murakami could have traveled to Los Angeles once the individual restriction order on her husband was lifted." Id. at 351.

Murakami appealed these decisions of the Court of Federal Claims to this court. We have jurisdiction from a final decision of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3).

## II. ANALYSIS

### A. Standard of Review

Statutory interpretation is a question of law reviewed <u>de novo</u>. <u>Imazio Nursery, Inc. v. Dania Greenhouses</u>, 69 F.3d 1560, 1564 (Fed. Cir. 1995); <u>see also</u> <u>Ishida v. United States</u>, 59 F.3d 1224, 1229 (Fed. Cir. 1995).

"We review legal determinations such as the Court of Federal Claims' decision to award summary judgment on the administrative record without deference, applying the same standard of review as the Court of Federal Claims." <u>Dysart v. United States</u>, 369 F.3d 1303, 1310 (Fed. Cir. 2004). In this case, the Court of Federal Claims applied the standard of review prescribed by the Act. <u>See</u> <u>Murakami III</u>, 52 Fed. Cl. at 235. The Act provides:

> A claimant may seek judicial review of a denial of compensation under this section solely in the [United States Court of Federal Claims], which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

50 U.S.C. app. § 1989b-4(h)(1) (2004).

Evidentiary determinations by the Court of Federal Claims, including motions to supplement the administrative record, are reviewed for abuse of discretion. <u>See</u> <u>Air Land Forwarders, Inc. v. United States</u>, 172 F.3d 1338, 1341 (Fed. Cir. 1999).

### B. Relevant Statutes, Regulations, and Legislative History

In 1980, Congress passed legislation establishing the Commission on Wartime Relocation and Internment of Civilians to document the impact of the internment on Japanese American citizens and permanent residents. <u>See generally</u> Commission on Wartime Relocation and Internment of Civilians Act, Pub. L. No. 96-317, 94 Stat. 964 (1980). The resulting Civil Liberties Act of 1988 enacted the recommendations of the

Commission, including a formal statement of apology and a one-time redress payment to each "eligible" individual. See 50 U.S.C. app. § 1989a(a) (2000) (apology); id. § 1989b-4(a)(1) (redress payment); Ishida, 59 F.3d at 1227. The Act then defined eligible individuals:

> For the purposes of this title . . . .
>
>> (2) the term "eligible individual" means any individual of Japanese ancestry . . . who, during the evacuation, relocation, and internment period—
>>
>>> (A) was a United States citizen or a permanent resident alien; and
>>>
>>> (B)(i) was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of—
>>>
>>>> (I) Executive Order Numbered 9066, dated February 19, 1942;
>>>>
>>>> (II) the Act entitled "An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones", approved March 21, 1942 (56 Stat. 173); or
>>>>
>>>> (III) any other Executive order, Presidential proclamation, law of the United States, directive of the Armed Forces of the United States, or other action taken by or on behalf of the United States or its agents, representatives, officers, or employees, respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry . . . .

50 U.S.C. app. § 1989b-7 (2000) (emphases added).

The Justice Department promulgated regulations to implement the Act. See 28 C.F.R. pt. 74 (2004); see also Redress Provisions for Persons of Japanese Ancestry, 54 Fed. Reg. 34,157 (Aug. 18, 1989) ("Redress Provisions"). Initially, the Justice Department's regulations stated that children born after their parents had voluntarily relocated from prohibited military zones, assembly centers, relocation camps, and internment camps were not eligible for redress under the Act. Redress Provisions, 54 Fed. Reg. at 34,160; see also Redress Provisions for Persons of Japanese Ancestry: Guidelines Under Ishida v. United States, 62 Fed. Reg. 19,928, 19,929 (Apr. 24, 1997)

04-5050                                        6

("Guidelines Under Ishida").  However, after this court's decision in <u>Ishida v. United States</u>, 59 F.3d 1224 (Fed. Cir. 1995), held such individuals to be eligible under the Act, the Justice Department revised its regulations and issued a Notice of Proposed Rulemaking.  <u>Redress Provisions for Persons of Japanese Ancestry</u>, 61 Fed. Reg. 17,667 (Apr. 22, 1996); <u>see also</u> <u>Guidelines Under Ishida</u>, 62 Fed. Reg. at 19,930.  The Justice Department considered, <u>inter</u> <u>alia</u>, comments regarding an extension of the proposed January 3, 1945 threshold date for eligibility.  <u>Guidelines Under Ishida</u>, 62 Fed. Reg. at 19,931-32.  Some comments advocated the date should be extended by up to three months to accommodate a family's inability to travel due to the advanced state of a woman's pregnancy and other hardships.  <u>Id.</u> at 19,932.  The Justice Department rejected such arguments, stating:

> Although the Department is sympathetic to persons who were in this situation, it must be recognized that after January 20, 1945, the law ceased to act to deprive affected individuals of their liberty to travel and reside as they saw fit.  Without a doubt, there were a number of families who, for various reasons, were unable to return for some time to the former exclusion zones.  However, the fact remains that after January 20, 1945, individuals were generally free under the law to decide for themselves whether and when they should return to the West Coast.  This is the basis for eligibility under <u>Ishida</u>, and the Department is bound by the court's strictures.

<u>Id.</u>  The Justice Department then amended its regulations to add 28 C.F.R. § 74.3(b)(9), explicitly stating that individuals born on or before January 20, 1945 to "parents who had been evacuated, relocated, or interned" from their original place of residence were eligible for relief under the Act.  <u>Id.</u> at 19,934.  Thus, the pertinent Justice Department regulations currently provide in relevant part:

> (a) An individual is found to be eligible if such an individual:
>    (1) Is of Japanese ancestry; and
>    (2) Was living on the date of enactment of the Act, August 10, 1988; and

(3) During the evacuation, relocation, and internment period was—
    (i) A United States citizen; or
    (ii) A permanent resident alien who was lawfully admitted into the United States; or
    (iii) An alien . . . ; and
(4) Was confined, held in custody, relocated, or <u>otherwise deprived of liberty or property as a result of</u>—
    (i) Executive Order 9066, dated February 19, 1942;
    (ii) The Act entitled "An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining, leaving, or committing any act in military areas or zones," approved March 21, 1942; or
    (iii) Any other Executive order, Presidential proclamation, law of the United States . . . respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry.
(b) The following individuals are deemed to have suffered a loss within the meaning of paragraph (a)(4) of this section:
    (1) Individuals who were interned under the supervision of the wartime Relocation Authority, the Department of Justice or the United States Army; or

\* \* \*

    (9) <u>Individuals born on or before January 20, 1945, to a parent or parents who had been evacuated, relocated, or interned from his or her original place of residence in the prohibited military zones on the West Coast, on or after March 2, 1942, pursuant to paragraph (a)(4) of this section, and who were excluded by Executive Order 9066 or military proclamations issued under its authority, from their parent's or parents' original place of residence in the prohibited military zones on the West Coast. This also includes those individuals who were born to a parent or parents who had "voluntarily" evacuated from his or her original place of residence in the prohibited military zones on the West Coast, on or after March 2, 1942, pursuant to paragraph (b)(3) of this section, and who were excluded by Executive Order 9066 or military proclamations issued under its authority, from their parent's or parents' original place of residence in the prohibited military zones on the West Coast.</u>
(c) <u>Paragraph (b) of this section is not an exhaustive list of individuals who are deemed eligible for compensation; there may be other individuals determined to be eligible under the Act on a case-by-case basis by the Redress Administrator.</u>

28 C.F.R. § 74.3 (2004) (emphases added).

C. Eligibility Under the Act

Murakami advances several arguments as to why he is eligible for a redress payment under the Act. We address each of these arguments in turn.

1. "Otherwise Deprived of Liberty"

First, Murakami argues that he is an eligible individual "otherwise deprived of liberty" under 50 U.S.C. app. § 1989b-7. Specifically, Murakami alleges that his situation is analogous to the appellant in Ishida v. United States, 59 F.3d 1224 (Fed. Cir. 1995), because he was deprived of liberty when he was excluded at the time of his birth from his parents' home of Los Angeles. Because his father, Arthur Murakami, was subject to an individual exclusion order until approximately one month before Murakami was born, he argues that governmental action prevented his family from traveling from Chicago to Los Angeles when Aiko Murakami was eight months pregnant.

The Government responds that the Court of Federal Claims correctly determined that Murakami is not entitled to relief under the Act. The Government argues this case is analogous to Higashi v. United States, 225 F.3d 1343 (Fed. Cir. 2000), which denied relief to a child born to parents of Japanese ancestry seventeen days after the restrictions on her parents were lifted. The Government argues that relevant precedent precludes relief and further that the Redress Office had a rational basis for denying Murakami relief.

In Ishida, appellant Ishida was born in Ohio in November 1942 after his parents were "voluntarily" relocated in March 1942 from their home in California to Ohio. 59 F.3d at 1228. The Government rejected Ishida's claim for redress under the Act, stating that the implementing regulations did not provide that children were eligible for redress if

they were born after their parents voluntarily relocated from prohibited military zones or internment camps. Id. at 1228-29. The Government stated that Ishida was ineligible because he was not personally "confined, held in custody, [or] relocated." Id. at 1230. On appeal to the Federal Circuit, we held that "Congress clearly intended to include as eligible [under the Act] anyone, including later born children, of Japanese ancestry who has been 'deprived of liberty' as a result of the laws and orders which caused them to be excluded from their family's place of residence in a prohibited military zone." Id. at 1229-30. This court interpreted the statutory language "otherwise deprived of liberty" as an alternate basis (in addition to being "confined, held in custody, [or] relocated") for recovery under the Act, concluding that any other interpretation would render the statutory language superfluous. Id. at 1230. The court held that "the Act entitles to compensation all children who were deprived of liberty because they were excluded from their family homes as a result of Executive Order 9066 and who could not return to their homes without committing a crime under the criminal statute." Id. The court observed that these children "suffered a grave deprivation of liberty as a direct result of government action excluding them (and their parents) from their family homes." Id. Thus, Ishida held that children born to parents of Japanese ancestry who were excluded from their family homes in prohibited military zones during the statutory period from December 7, 1941 to June 30, 1946 are entitled to compensation, because these children were "otherwise deprived of liberty" within the meaning of the Act when they were "excluded by law" from their parent's or parents' original place of residence. Id. at 1226.

In Higashi, appellant Higashi's parents were first removed from their home in California to a relocation center under Executive Order 9066. 225 F.3d at 1345. From there, they received government permission to again relocate to Boise, Idaho, where Higashi was later born. Id. Higashi was born on February 6, 1945, seventeen days after the Government's rescission of Executive Order 9066 became effective on January 20, 1945. See id. The Justice Department's regulations stated that eligibility for redress extends to persons born on or before January 20, 1945, as well as others that can establish their eligibility on a case-by-case basis. Id. at 1347 (citing 28 C.F.R. § 74.3(b)(9), (c)). Higashi argued that her family was constructively or actively restrained by governmental action after January 20, 1945, based on her family's alleged belief they were under continued travel restrictions. Id. at 1348. The Federal Circuit considered whether the January 20, 1945 cut-off date in the regulations conflicts with the statutory eligibility period that extended to June 30, 1946. Id. at 1347. This court held that after January 20, 1945, newborns and other family members were no longer "excluded by law" under Ishida from returning to their original residences:

> In Ishida, this court interpreted the Act to extend compensation to newborns excluded by law from their parents original place of residence as a result of Executive Order 9066. Because all restrictions on travel and relocation were rescinded as of January 20, 1945 by Proclamation No. 21, from that date forward newborns or other family members were no longer "excluded by law" from returning to their original residences. Thus, the holding of Ishida does not help plaintiff to obtain a redress payment.

Id. (internal citation and quotation marks omitted). This court observed that individuals living between the statutory period of December 1941 to June 30, 1946 must meet several requirements to establish their eligibility under the Act. Id. We held that the January 20, 1945 regulatory cut-off date was consistent with the Act, and therefore the determination that no compensable "deprivation of liberty" occurred for individuals born

after the United States had lifted all travel and relocation restrictions on or before January 20, 1945 was entitled to deference. Id. This court further affirmed the Court of Federal Claims' finding that the Government did not constructively deprive Higashi of liberty after January 20, 1945 by inducing her family to believe they could not return home. Id. at 1348-49. The decision in Higashi found no clear error in the Court of Federal Claims' finding that there was adequate public notice, including prominent newspaper articles and widespread community knowledge, to inform Higashi's family that the governmental restraints on travel and relocation had been lifted. See id.

In the present case, the Court of Federal Claims observed that regulations promulgated by the Redress Office establish categories of individuals deemed to have been "otherwise deprived of liberty," as well as a catchall provision covering other individuals deemed to be eligible by the Redress Administrator on a case-by-case basis. Murakami III, 52 Fed. Cl. at 236. The court stated that "the [Redress Office], at the least, inadequately considered whether, aside from applying the modified version of the Ishida provision in the regulation, plaintiff was 'otherwise deprived of liberty' within the meaning of . . . the regulations" and the Act. Id. at 237. The court observed that the Redress Office applied "a faulty, overly narrow reading of Ishida," and found no evidence that the Redress Office conducted the case-by-case analysis required by 28 C.F.R. § 74.3(c). Id. at 238. Instead, the Redress Office's "decided view [was] that a deprivation of liberty must result from a then-existing legal restraint, rather than from the practical hindrances flowing from a prior legal restraint." Id. The Court of Federal Claims concluded that the Redress Office's approach appeared inconsistent with the plain language of 50 U.S.C. app. § 1989b-7 that an individual is eligible for redress if

04-5050                                12

deprived of liberty "as a result of" governmental laws or orders.  Id. at 238-39.  The court

observed:

> [T]he plain language of the statute connotes that if the deprivation of liberty was caused by some prior action of the United States, redress might be obtainable even though the prior legal restraint was removed prior to the time the deprivation was actually suffered.  As such, it is far from apparent that the Congress intended that an otherwise eligible individual born an hour or day—or perhaps 33 days—after a specific exclusion order was rescinded would be ineligible for redress even if it were shown that it was practically impossible or at least unreasonably dangerous for a woman in the advanced stage of pregnancy to have traveled so that her child could be born in the family home.

Id. at 240.  Accordingly, the court remanded Murakami's claim to the Justice

Department for a redetermination of Murakami's eligibility for redress under the Act and

its implementing regulations.  Id. at 243.

On remand, the Justice Department found that under the regulations, once the

governmental proclamations and individual exclusion orders were rescinded, there was

no legal bar prohibiting individuals of Japanese ancestry from returning to the West

Coast.  According to the Justice Department, children born after the rescission are not

eligible for redress payments.  The Justice Department concluded that because

Murakami was born several months after Executive Order 9066 was rescinded and

more than one month after Arthur Murakami's individual exclusion order was lifted, he

was not entitled to a redress payment.  In an alternative finding, the Justice Department

conducted the case-by-case analysis requested by the Court of Federal Claims and

concluded that Aiko Murakami's unwillingness to travel based on her pregnancy was not

attributable to governmental action.  The Justice Department concluded that the

Murakami family's decision not to return to the West Coast was solely a "personal

decision" based not only on Aiko Murakami's unwillingness to travel during her

pregnancy, but also on the family's lack of housing and Arthur Murakami's lack of employment in the Los Angeles area.

Following the remand proceedings, the Court of Federal Claims categorically rejected the notion that a deprivation of liberty must stem from a then-existing legal restraint. Murakami IV, 58 Fed. Cl. at 349-50. However, the court found that the Redress Office's redetermination that Aiko Murakami's decision not to travel to Los Angeles once the individual restriction on Arthur Murakami was lifted was for personal reasons not attributable to governmental action was within the bounds of reasoned decision-making. Id. at 351. The court thus concluded that Murakami was not eligible for relief under the Act.

Based on our review of the Act, we conclude that the Court of Federal Claims correctly interpreted the statutory provisions applicable to this case. Ishida held that "Congress clearly intended to include as eligible [under the Act] anyone, including later born children, of Japanese ancestry who has been 'deprived of liberty' as a result of the laws and orders which caused them to be excluded from their family's place of residence in a prohibited military zone." 59 F.3d at 1229-30. Higashi did not subsequently promulgate a per se rule that children born following the lifting of government-imposed travel and relocation restrictions, including Proclamation No. 21, are ineligible for redress under the Act. Higashi instead held that governmental regulations specifying January 20, 1945 as a cut-off date, after which children were no longer "excluded by law" from returning to their homes, was consistent with the language of the Act. 225 F.3d at 1347. Higashi expressly recognized that additional governmental regulations specified that individuals could also establish their eligibility on

a case-by-case basis.  Id.  Higashi left open the question of whether children born after the lifting of travel and relocation restrictions imposed on their parents might be eligible for redress if they were "otherwise deprived of liberty . . . as a result of" governmental action under section 1989b-7 of the Act.  We conclude that such children are potentially eligible for redress under the Act.

The Act provides that U.S. citizens and permanent resident aliens are eligible for redress if they were "confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of" certain enumerated governmental actions.  50 U.S.C. app. § 1989b-7(2) (2000).  According to dictionary definitions, the verb "result" commonly means "to proceed, spring, or arise as a consequence, effect, or conclusion." Webster's Third New International Dictionary 1937 (1993).  Thus, the broad language of the Act does not limit eligibility to individuals "otherwise deprived of liberty" only during the pendency of governmental action, but also to individuals "otherwise deprived of liberty" as a consequence or effect of governmental action.  This interpretation is consistent with our prior construction of similar statutory language in Gardner v. Brown, 5 F.3d 1456 (Fed. Cir. 1993), which provided that the Veterans Administration would compensate veterans for "an injury, or an aggravation of an injury, [occurring] as the result of hospitalization, medical or surgical treatment, or the pursuit of a course of vocational rehabilitation."  38 U.S.C. § 1151 (Supp. V 1988) (emphasis added); see also Gardner, 5 F.3d at 1458.  In Gardner, we rejected the VA's interpretation that "as the result of" should be limited to injuries stemming from carelessness, negligence, or other fault on the part of the VA:

> We are convinced that "as the result of" as used in 38 U.S.C. § 1151 mandates only a causation requirement.  See Webster's Third New Int'l

Dictionary 1937 (1971) (defining "result" as "a consequence, effect, issue, or conclusion"). Under section 1151 the specified treatment must cause the injury or the aggravation of injury.

5 F.3d at 1459. The Supreme Court affirmed the Federal Circuit's construction of "as the result of":

> In a second attempt to impose a VA-fault requirement, the Government suggests that the "as a result of" language of § 1151 signifies a proximate cause requirement that incorporates a fault test. Once again, we find the suggestion implausible. This language is naturally read simply to impose the requirement of a causal connection between the "injury" or "aggravation of an injury" and "hospitalization, medical or surgical treatment, or the pursuit of a course of vocational rehabilitation."

Brown v. Gardner, 513 U.S. 115, 119 (1994). Other circuit courts of appeal have reached similar conclusions. See, e.g., Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 975 (10th Cir. 1994) (noting in construing Army regulations, "[t]he use of the plain language—'as a result of'—is logically interpreted to mean 'caused by'"); Am. Ins. Co. of City of Newark v. Keane, 233 F.2d 354, 360 (D.C. Cir. 1956) (applying the dictionary definition of the term "result" and holding, in an insurance case, that "if the claim proceeds from or arises as a consequence of or is occasioned by the operation of the vessel's engine, it is one 'resulting from' such operation"). Moreover, if Congress had intended eligibility only to extend to children born while the legal restraint on their parents was in place, it could have used stricter language in crafting the Act. See Doyon, Ltd. v. United States, 214 F.3d 1309, 1316 (Fed. Cir. 2000) ("If Congress had intended such a limited effect, it could have crafted a more narrowly tailored statute."); see also Williams v. Taylor, 529 U.S. 420, 431 (2000) (stating that when interpreting a statute, "[w]e give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import" (internal quotation marks omitted)).

04-5050                                                16

Based on the plain language of the statute, we hold that children born after January 20, 1945 and following the lifting of their parent's or parents' travel and relocation restrictions may be eligible for redress payments if they can establish, on an individual case-by-case basis, that they were "otherwise deprived of liberty" as a consequence or effect of the governmental actions set forth in section 1989b-7 of the Act, even though the legal restraint was removed prior to the time the deprivation was suffered. The Justice Department's position of categorical ineligibility of children born after January 20, 1945, or after individual exclusion orders restricting their parent's or parents' travel were lifted, see Guidelines under Ishida, 62 Fed. Reg. at 19,932, is inconsistent both with the language of the statute and the Justice Department's own regulations specifying that individual claims are to be considered on a case-by-case basis, see 50 U.S.C. app. § 1989b-7 (2000); 28 C.F.R. § 74.3(c) (2004).

The Court of Federal Claims correctly recognized that an individual may be eligible for redress under the Act for a deprivation of liberty suffered after a prior governmental restraint was lifted. Murakami III, 52 Fed. Cl. at 240. Applying this standard of eligibility to the facts found by the Redress Office, the Court noted that Aiko Murakami could have traveled to California once the individual exclusion order imposed on her husband, Arthur Murakami, was lifted. Murakami IV, 58 Fed. Cl. at 351. The court further concluded that Murakami's medical evidence, presented in a one-page declaration submitted by Aiko Murakami's doctor, Dr. Shigekawa, was conclusory in its hypothetical recommendation that Aiko Murakami should not have traveled when pregnant. Id. at 351 n.3. The court also rejected Murakami's allegations that, even if not medically impractical, it was impossible for the Murakami family to wrap up their

affairs in Chicago, find employment, and set up a new household in Los Angeles. Id. at 351 n.4. The court declined to consider these allegations on the ground that it "carr[ied] too far the concept of causation associated with the 'as a result of' language of the Act." Id. After reviewing the administrative record and the decision of the Court of Federal Claims, we conclude that the determination that Murakami was ineligible for redress under the Act was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 2. Constitutional Violations Allegedly Suffered by Arthur Murakami

Murakami additionally argues that he was deprived of liberty as a result of the Government's denial of his father's constitutional right of interstate travel and due process. Based on these constitutional violations, Murakami argues that he was by extension also denied the right to travel, and thus is eligible for redress under the Act.

The Court of Federal Claims rejected Murakami's argument, concluding that "the Act does not directly compensate for a harm suffered by another." Murakami III, 52 Fed. Cl. at 236 n.2. We agree. The statute makes clear that an individual is eligible under the Act based on harms personally suffered by that individual, and not based on harms suffered by family members or other individuals. See 50 U.S.C. app. § 1989b-7(2) (2000) ("[T]he term 'eligible individual' means any individual of Japanese ancestry, or the spouse or a parent of an individual of Japanese ancestry . . . who, during the evacuation, relocation, and internment period . . . was confined, held in custody, relocated, or otherwise deprived of liberty or property . . . ."). Our prior decision in Ishida is consistent with this view, noting that the eligibility under the Act of children born to parents of Japanese ancestry was based on harms personally suffered

by the children.  Ishida, 59 F.3d at 1230 (observing that children born to parents of Japanese ancestry "suffered a grave deprivation of liberty as a direct result of government action excluding them (and their parents) from their family homes").  Thus, the Court of Federal Claims correctly held that Murakami is not eligible for relief under the Act based on the alleged constitutional harms suffered by his father, Arthur Murakami.

### 3. "Internal Passport" Travel Restrictions

Murakami further argues that he was deprived of liberty under the Act because the Government constructively restricted his father's, Arthur Murakami's, right to travel to the West Coast after his individual exclusion order was lifted on July 21, 1945. Murakami argues that Arthur Murakami reasonably believed that he risked arrest and possible physical harm if he traveled to California without a government photo identification card.  The Government argues that Murakami's argument was waived because he failed to raise it with the administrative agency, the Redress Office, in the first instance.

The Court of Federal Claims held that Murakami failed to raise this issue before the Redress Office and, thus, was precluded from raising the issue in the first instance before the Court of Federal Claims.  Murakami II, 46 Fed. Cl. at 738; Murakami III, 52 Fed. Cl. at 236-37.  In his communications with the Redress Office prior to his appeal to the Court of Federal Claims, Murakami never argued that Arthur Murakami was constructively prevented from traveling after his travel restriction was lifted because of his belief that he could not travel to the West Coast without a government identification card.  Murakami only stated to the Redress Office that "[a] later letter dated 21 July

1945 . . . rescinding [my father's] exclusion order was far too late for my parents to return to the West Coast as I was born on August 23, 1945."  We find no record evidence that Murakami raised the argument concerning his father's constructive travel restriction with the administrative agency.  The Court of Federal Claims thus correctly concluded that the argument was waived.  United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."); Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("A party does not preserve or waive an issue based on the arguments it presented to an administrative agency; a party merely exhausts that issue before the agency so as to give a court the proper basis to review that issue on appeal or via a complaint."); see also Southwestern Bell Tel. Co. v. Pub. Util. Comm'n, 208 F.3d 475, 487 (5th Cir. 2000) ("The failure to raise an issue at the administrative level waives the right to appellate review of that issue.").

### D.  Motion to Supplement the Administrative Record

Finally, Murakami argues that the court abused its discretion in denying his request to supplement the administrative record and to take judicial notice of certain government documents.  Murakami argues on appeal that the documents are relevant to whether Arthur Murakami was subjected to an "undue and unwarranted restriction" because the Government did not lift his travel restriction until July 21, 1945, and that Arthur Murakami believed that he could not travel to the West Coast even after the travel restriction was lifted.  Murakami argues that the court should have allowed him to

supplement the administrative record under an exception permitting such supplementation when the agency fails to consider facts relevant to its final decision. Murakami claims, in the alternative, that the Court of Federal Claims should have taken judicial notice of the authenticity of and the existence of statements in those documents because he met the requirements of Federal Rule of Evidence 201. The Government responds that the Court of Federal Claims correctly considered all appropriate grounds for reopening the administrative record and correctly determined Murakami could not supplement the record.

We discern no abuse of discretion in the court's denial of Murakami's motion. The Court of Federal Claims thoroughly examined Murakami's evidence and arguments. The court observed that it confines itself to the record created in the proceedings below, except in limited circumstances, Murakami II, 46 Fed. Cl. at 734, and that Murakami's documents related to a legal theory he did not raise with the agency below, namely that his father was prevented from traveling due to concerns of arrest and physical harm even though he was not subject to de jure travel restrictions, id. at 738. The court stated that Murakami could not "argue that the agency below failed to consider factors relevant to a legal theory he never raised, particularly where the theory was not obvious and irrationally neglected by the agency." Id. at 738. As we stated in Section II.C.3, supra, the Court of Federal Claims correctly found that Murakami failed to present to the Redress Office the underlying theory upon which his documents pertain. Thus, the Court of Federal Claims was within its discretion in denying Murakami's motion to supplement the administrative record with documents pertinent to waived arguments.

Moreover, we discern no abuse of discretion in the Court of Federal Claims' refusal to take judicial notice of Murakami's proffered documents under Federal Rule of Evidence 201(b). Rule 201(b) provides:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Murakami asked the court to take judicial notice of the authenticity of the documents and the statements made therein. Murakami II, 46 Fed. Cl. at 738-39. The court declined to use Rule 201 to circumvent the general rule against supplementing the administrative record. Id. at 739. Furthermore, it correctly found that Murakami's documents did not satisfy the requirements of Rule 201(b) because neither the authenticity nor content of the documents was generally known. Id.

## III. CONCLUSION

Because the Court of Federal Claims correctly concluded that Murakami was not entitled to compensation under the Act, and because the court did not abuse its discretion in denying Murakami's evidentiary motions, we affirm.

AFFIRMED