V. Conclusion ............................................................. 326

**PITNEY BOWES GOVERNMENT SOLUTIONS, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

and

**Stanley Associates, Inc., Intervening Defendant.**

**No. 10–257C.**

United States Court of Federal Claims.

Filed Under Seal: May 28, 2010.

Reissued: June 4, 2010.

William M. Weisberg, Bryan Cave LLP, Washington, D.C., for plaintiff. With him on the briefs were Joyce L. Tong and William E. Olsen, Bryan Cave LLP, Washington, D.C.

David A. Levitt, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Don Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Barry C. Hansen and Gordon R. Jimson, Justice Management Division, Office of General Counsel, Washington, D.C.

Leigh T. Hansson, Reed Smith LLP, Washington, D.C., for intervening defendant. With her on the briefs and at the hearing were Gregory S. Jacobs, Daniel Z. Herbst, and Joelle E.K. Laszlo, Reed Smith LLP, Washington, D.C.

### OPINION AND ORDER [1]

LETTOW, Judge.

This post-award bid protest concerns a contract to perform mail management, warehousing, and related support services for the Department of Justice ("the Department" or "DOJ"). The contract was awarded to Stanley Associates, Inc. ("Stanley") on April 1, 2010. The protestor, Pitney Bowes Government Solutions, Inc. ("Pitney Bowes"), had been the incumbent contractor and also sought the award of the new contract. After the award to its competitor, Pitney Bowes filed a protest with the Government Accountability Office ("GAO") on April 15, 2010, which it withdrew on April 21, 2010. Compl. ¶ 33. Two days later, on April 23, 2010, Pitney Bowes filed its protest in this court. Stanley very promptly moved to intervene

---

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before June 3, 2010. Redactions were proposed by the parties, and the court held a hearing on June 4, 2010, to address the grounds for the proposals and to make determinations about permissible redactions. The resulting redactions are shown by asterisks enclosed within brackets, *e.g.*, "[* * *]."

and that motion was granted on April 27, 2010.

With the submission of its complaint, Pitney Bowes filed a motion to supplement the administrative record with deposition testimony relating to its claim that there existed actual or perceived bias in favor of Stanley in the procurement process, stemming from a friendly, personal relationship between [* * *], a member and chairperson of the Technical Evaluation Panel ("TEP") that had considered the competitors' offers, and Donald Dilks, a vice president of BrightKey, Inc. ("BrightKey"), a subcontractor of Stanley.[2] Consideration of that motion was briefly held in abeyance to enable the court to hear Pitney Bowes' application for temporary relief, which occurred at a hearing held on April 27, 2010. The need for a decision on that application was obviated when the parties agreed to suspend the start of the new contract for a period of 90 days and to extend Pitney Bowes' contract for that time. Hr'g Tr. 4:14 to 5:3, 6:18–24 (Apr. 27, 2010). An expedited schedule was arranged for submission of the administrative record for the protested procurement and for filing by the parties of cross-motions and briefs for judgment on that record. In addition, a schedule was developed for briefing Pitney Bowes' motion to supplement the administrative record and a second motion by Pitney Bowes to supplement that record, which briefing would overlap the submission and briefing of the cross-motions for judgment. Hr'g Tr. 7:8 to 24:1 (Apr. 27, 2010).

Subsequently, the government filed the administrative record in this case on April 29, 2010, and Pitney Bowes filed its second motion to supplement the administrative record on May 4, 2010, alleging inconsistencies and gaps in the record regarding the evaluation and rating of the competing proposals by Stanley and Pitney Bowes as a basis for discovery and supplementation. The motions to supplement have been fully briefed and were addressed at a hearing.

## BACKGROUND[3]

Pitney Bowes is the incumbent contractor, providing mail management, warehousing, and related support services to the Department. Pl.'s Mem. in Support of the Mot. to Supplement the Administrative Record at 2 ("Pl.'s First Mot."). [* * *] was one of two Contracting Officer's Technical Representatives ("COTRs") for the existing DOJ contract and she also served as the chairperson of the Technical Evaluation Panel for the protested procurement. Id.; see also Def.'s Opp'n to Pl.'s First and Second Mots. to Supplement the Administrative Record ("Def.'s Opp'n") Ex. 1 ¶ 2 (Aff. of [* * *]) ("[* * *] Aff."). Prior to joining DOJ in 2002, [* * *] worked for a company called DDD Company, owned by Donald Dilks, who was also the company's chief executive officer. [* * *] Aff. ¶¶ 4–6. DDD was the contractor under the prior, original DOJ contract. Pl.'s First Mot. at 2. The parent company of Pitney Bowes, Pitney Bowes, Inc., acquired DDD in the fall of 2003. Id. Ex. 1 ¶¶ 2–3 (Aff. of William Michael Rooney, Director of Area Operations, Pitney Bowes) ("Rooney Aff."). Mr. Dilks left DDD and is currently an executive of BrightKey, which is engaged in the same type of contracting activity as Pitney Bowes. Id. ¶ 6.

Pitney Bowes asserts that as the current DOJ contract approached expiration, [* * *] "suggested to [Pitney Bowes] that collaborating with BrightKey on the upcoming recompetition [of the DOJ contract] would be in [Pitney Bowes'] best interest." Pl.'s First Mot. at 2 (citing Rooney Aff. ¶¶ 5–6); Pl.'s First Mot. Ex. 2 ¶¶ 5–6 (Aff. of James Miller, Federal Account Manager, Pitney Bowes) ("Miller Aff."). On November 13, 2008, Pitney Bowes and BrightKey entered into a teaming arrangement to work towards a subcontractor agreement respecting the competition for the new contract. Pl.'s First Mot.

---

2. Pitney Bowes initially based its motion for supplementation also on the existence of an actual or perceived conflict of interest. However, at the hearing held on May 14, 2010, it backed away from that assertion in favor of its bias allegation. See Hr'g Tr. 6:20 to 7:5 (May 14, 2010).

3. The recitations that follow are drawn from the pleadings, the administrative record, the motions and briefs of the parties, affidavits submitted with the parties' briefs, and the representations of counsel at the hearings.

at 2 (citing Rooney Aff. ¶ 9; Miller Aff. ¶ 9). [* * *] denies having ever encouraged Pitney Bowes to team with BrightKey, and asserts that she was first informed of the teaming arrangement after the fact, in November 2008. [* * *] Aff. ¶¶ 20–22. In accord with the teaming agreement, Pitney Bowes and BrightKey exchanged pricing information. Pl.'s First Mot. at 2–3. In February 2009, Pitney Bowes also entered into a teaming agreement with Stanley to exchange pricing information and explore forming a partnership for the new competition. *Id.* at 3. In April 2009, both of the teaming agreements involving Pitney Bowes were dissolved. *Id.;* Rooney Aff. ¶ 11; Miller Aff. ¶ 11.

On November 24, 2009, the Department's Justice Management Division issued Request for Proposal DJJA–09–RFP–0592 to provide mail management, warehousing, and related support services pursuant to a "combination firm-fixed price ... and labor hour ... [contract] with both a definite quantity, definite delivery portion and an indefinite quantity, indefinite delivery portion." AR 8–000237 (Request for Proposal DJJA–09–RFP–0592 (Nov. 24, 2009)) ("Request for Proposal").[4] The Request for Proposal described the contract as consisting of a "Base Period" through September 30, 2010, followed by four one-year "Option Periods" and up to two additional one-year "Award Term" option periods awarded based on overall performance. AR 8–000242 (Request for Proposal § B. 1(B)). Pitney Bowes responded to the solicitation on December 22, 2009. AR 14–000629 (Pitney Bowes' Response to Solicitation No. DJJA–09–RFP0592, Vol. I, Business–Price Proposal (Dec. 22, 2009)); AR 15–000757 (Pitney Bowes' Response to Solicitation No. DJJA–09–RFP–0592, Vol. II, Technical Proposal (Dec. 22, 2009)). On April 1, 2010, DOJ awarded the contract to Stanley, with Bright-Key as a subcontractor. AR 26–001213 (Notification of Award (Apr. 1, 2010)); Pl.'s First Mot. at 4. The next day, on April 2, 2010, Pitney Bowes requested a debriefing, which DOJ provided in writing on April 8, 2010.

Pl.'s First Mot. at 4; AR 27–001215 (Debriefing Letter (Apr. 8, 2010)). The debriefing letter listed the awardee Stanley's evaluated price as $160,346,204, approximately [* * *] less than Pitney Bowes' proffered price. AR 27–001216 (Debriefing Letter ¶ 3, Tbl. 1). It also stated that Pitney Bowes' strengths as the incumbent contractor were "[* * *]." AR 27–001217 (Debriefing Letter ¶ 4).

## STANDARDS FOR DECISION

■ When considering a bid protest, the court adheres to "the standards set forth in section 706 of title 5," *i.e.*, the section of the Administrative Procedure Act ("APA") that prescribes the scope of judicial review of agency actions. 28 U.S.C. § 1491(b)(4) (referring to 5 U.S.C. § 706). Under the APA, the court may set aside an agency decision if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "As a general rule, in determining whether an agency's actions are arbitrary or irrational, the 'focal point for judicial review ... should be the administrative record already in existence, not some new record made initially by the reviewing court.' " *Knowledge Connections, Inc. v. United States,* 79 Fed. Cl. 750, 759 (2007) (quoting *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (which in turn quoted *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973))). However, the administrative record of a protested procurement is not always a complete record of documentary materials generated during the procurement and maintained contemporaneously with the occurrence of the salient events or actions associated with the procurement, and this case serves as a good example of such an instance.

■ Motions to supplement the administrative record in bid protest actions in this court are governed by the Federal Circuit's recent decision in *Axiom Resource Management, Inc. v. United States,* 564 F.3d 1374

**4.** "AR ___" refers to the administrative record filed with this court in accordance with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, *e.g.,* "AR 8–000237." The pages of the administrative record are paginated sequentially without regard to the tabs.

(Fed.Cir.2009). "[S]upplementation of the [administrative] record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id.* (quoting *Murakami v. United States,* 46 Fed.Cl. 731, 735 (2000), *aff'd,* 398 F.3d 1342 (Fed.Cir.2005)). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Id.* (quoting *Murakami,* 46 Fed.Cl. at 735). However, to perform an effective review pursuant to the APA, the court must have a record containing the information upon which the agency relied when it made its decision as well as any documentation revealing the agency's decision-making process. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("[S]ince the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence[,] it may be necessary for the [d]istrict [c]ourt to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard."), *abrogated in an unrelated respect by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (APA does not constitute an implied grant of subject matter jurisdiction to review agency actions); *see also Montana Fish, Wildlife, & Parks Found., Inc. v. United States,* 91 Fed. Cl. 434, 440–41 (2010).

 Where bias is alleged, the administrative record frequently will not be complete or suffice to prove or disprove the allegation. Consequently, to address bias, the court will entertain extrarecord evidence and permit discovery when there has been a "strong showing of bad faith or improper behavior" such that without discovery the administrative record cannot be trusted. *Alabama Aircraft Indus., Inc. v. United States,* 82 Fed.Cl. 757, 766 (2008) (internal quotation omitted). The strong showing must have an evidentiary foundation and not rest merely on counsel's argument, suspicion, or conjecture. *Madison Servs., Inc. v. United States,* 92 Fed.Cl. 120, 130–31 (2010). "[A]llegations of bad faith and bias [must be] sufficiently well

grounded to warrant supplementation of the [a]dministrative [r]ecord, [and] based upon hard facts." *L–3 Commc'ns Integrated Sys., L.P. v. United States,* 91 Fed.Cl. 347, 356 (2010) (internal quotation omitted). Essentially what is required is "a threshold showing of either a motivation for the [g]overnment[al] employee to have acted in bad faith or of conduct that is hard to explain absent bad faith." *Id.* at 355 (citing *Beta Analytics Int'l, Inc. v. United States,* 61 Fed.Cl. 223, 226 (2004)). Although "the agency decision is entitled to a presumption of regularity," *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1338 (Fed.Cir.2001), this presumption may be rebutted by an appropriate factual predicate. *OTI Am., Inc. v. United States,* 68 Fed.Cl. 108, 118 (2005). Further, allowing for deposition testimony of the contracting officer or other governmental official in a bid protest, where appropriate, "may enable the court to satisfy its statutory duty to give due regard to the need for expeditious resolution of the action." *Asia Pac. Airlines v. United States,* 68 Fed.Cl. 8, 18–19 (2005) (allowing supplementation where rationale of decision makers was not apparent from the administrative record) (internal quotations omitted); *see also Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1339 (allowing deposition of contracting officer to elucidate grounds for his decisions and determine whether a rational basis was lacking).

## ANALYSIS

### A. *Allegations of Personal Bias*

 The burden of proof required for supplementing the administrative record is lower than that required for demonstrating bad faith or bias on the merits. The test for supplementation is whether there are sufficient well-grounded allegations of bias to support an inquiry and supplementation; the protesting plaintiff need not make a showing of clear and convincing evidence of bias on the merits. *L–3 Communications,* 91 Fed. Cl. at 354. "Consistent with this standard, ... trial courts have [only] required a plaintiff to assert a reasonable factual predicate

for such allegation." *Id.* at 355 (citing *Beta Analytics*, 61 Fed.Cl. at 226).

■ Here, there are indicia of bias in circumstances associated with the procurement. Pitney Bowes has submitted affidavits supporting its allegations of pre-procurement communications between [* * *] and Pitney Bowes regarding Pitney Bowes' cooperation with BrightKey, a company for which Mr. Dilks serves as an executive. *See* Rooney Aff. ¶ 7 ("[* * *] told [Mr. Rooney] that it would be in [Pitney Bowes'] best interest to collaborate with BrightKey ... as a subcontractor in an effort to re-compete for the [DOJ] contract. I know that [* * *] formerly worked with Donald Dilks, who is an executive at BrightKey."); Miller Aff. ¶ 7 (same). In like vein, during a meeting on April 23, 2009 between [* * *] and Pitney Bowes, [* * *] "read for [Mr. Rooney and Mr. Miller] [an] email [she][had] received from Mr. Dilks and asked them the status of the relationship between [Pitney Bowes] and BrightKey." [* * *] Aff. ¶ 27. The affidavits submitted by Pitney Bowes add that during the meeting on April 23, 2009, [* * *] also stated that "[Pitney Bowes] was in default of its agreement with BrightKey and that BrightKey would potentially be looking for other companies to partner with on the [DOJ] contract." Rooney Aff. ¶ 12; Miller Aff. ¶ 12.

Pitney Bowes supports these allegations of personal bias by comparing unfavorable references in the debriefing letter about Pitney Bowes' past performance with the fact that Pitney Bowes contemporaneously received a renewed award of a separate mail management contract Pitney Bowes held with the Environment and Natural Resources Division of DOJ. Pl.'s First Mot. at 7 (citing AR 27–001222 (Debriefing Letter); Rooney Aff. ¶ 16).

The government has responded to these allegations by producing a series of e-mails between [* * *] and Mr. Dilks, and has requested that the e-mails be made part of the administrative record. *See* Def.'s Opp'n at 13 (referring to attachments to [* * *] Aff. and Aff. of Miguel B. Shivers, contracting officer with DOJ's Justice Management Division Procurement Services Staff ("Shivers Aff.") (attached as Ex. 2 to Def.'s Opp'n)). The court will treat that proffer as a motion by the government to supplement the administrative record, and grant that motion. *See Alabama Aircraft*, 82 Fed.Cl. at 765 (finding that supplementation of the administrative record with materials pertinent to the procurement and generated prior to or contemporaneous with the procurement was allowed to "ensure that the administrative record is complete").

The government also endeavors to rebuff Pitney Bowes' contention that a number of actions taken by [* * *] are only explicable by her personal bias in favor of BrightKey, offering innocent explanations for the circumstances cited by Pitney Bowes. For example, the government explains that any perceived approval of a teaming agreement between Pitney Bowes and BrightKey by [* * *] "does not demonstrate that she was biased in favor of BrightKey but, instead, that she felt [Pitney Bowes'] performance could be improved through a qualified teaming partner, whether BrightKey or another entity." Def.'s Opp'n at 9 (citing [* * *] Aff. ¶ 25). Further, if [* * *] "appeared to be upset and disappointed that [Pitney Bowes] decided not to partner with BrightKey," *see* Rooney and Miller Affs. ¶ 13, the government offers the benign explanation that [* * *]'s reaction "was not, as she explains in her affidavit, because she wanted BrightKey as the teaming partner but because ... she did not believe [Pitney Bowes] had the resources [on its own] to improve its performance on the current M[ail] M[anagement] W[arehousing] & R[elated Services] contract." Def.'s Opp'n at 10 (citing [* * *] Aff. ¶¶ 30–31).[5] Finally, the government

---

5. In addition, direct conflicts are evident in affidavit testimony of [* * *] on the one hand and Messrs. Rooney and Miller on the other hand. *See, e.g.,* [* * *] Aff. ¶ 22 (denying, as alleged in the affidavits of Messrs. Ronney and Miller, that she told Pitney Bowes "it would be in [the company's] best interest to collaborate with Bright-Key") (quoting Rooney and Miller Affs. ¶ 7); *id.* ¶ 27 (denying that she said Pitney Bowes "was in default of its teaming agreement with Bright-Key") (quoting Rooney and Miller Affs. ¶ 12); *id.* ¶¶ 29–30 (denying statements by Messrs. Rooney and Miller that "after learning of the dissolution of the teaming agreement, [she] 'expressed

points to evidence in the administrative record supporting the statements made in the debriefing letter regarding Pitney Bowes' performance of the separate mail management contract for the Environment and Natural Resources Division. *See* Def.'s Opp'n at 11 (citing AR 21–001179 (Contractor Performance Report (Nov. 30, 2008 to Nov. 30, 2009)) ("The quality of deliverables remains very good but we still continue to run into situations where the lack of management controls has allowed sloppy errors to go unnoticed. [Quality Control] is still not Pitney's strength.")).

Although the government has provided innocuous explanations for the indicia of bias Pitney Bowes has identified, and those explanations may well ultimately be proven correct, that proffer does not diminish the threshold showing that Pitney Bowes has made. The court finds Pitney Bowes' allegations of bias to be sufficiently well grounded to warrant limited discovery and supplementation of the administrative record. *See L–3 Communications*, 91 Fed.Cl. at 356 (finding plaintiff's allegation of bias to be sufficiently well grounded and permitting supplementation); *J.C.N. Constr. Co. v. United States*, 60 Fed.Cl. 400, 404–05 n. 8 (2004), *aff'd*, 122 Fed.Appx. 514 (Fed.Cir.2005) (allowing limited depositions where JCN had proffered documentary evidence tending to support bias and *de facto* debarment claims); *Galen Med. Assocs., Inc. v. United States*, 56 Fed.Cl. 104, 109 (2003), *aff'd*, 369 F.3d 1324 (Fed.Cir. 2004) (allowing depositions where plaintiff alleged a pattern of bias); *see also AshBritt, Inc. v. United States*, 87 Fed.Cl. 344, 366 (2009) ("Allowing a protest to be decided upon an [administrative record] which does not reflect what actually transpired would perpetuate error and impede and frustrate effective judicial review.").

### B. *Intentional Destruction of Rating Sheets*

In an affidavit filed with the court, Mr. Shivers, the contracting officer, avers that he caused to be destroyed the rating sheets prepared by the individual members of the TEP once the final consensus report of the TEP had been completed and submitted. Shivers Aff. ¶¶ 13–14. Mr. Shivers states that ordering the destruction of "all working, draft, and obsolete documents and files [including the individual TEP members' score sheets] prior to making [an] award of a procurement" is his "standard practice," *id.* ¶ 15, a practice Mr. Shivers asserts "is consistent with FAR [48 C.F.R.] Subpart 4.8, specifically §§ 4.802 and 4.803." *Id.* ¶ 16.

The TEP was comprised of three members: [* * *], chairperson, and [* * *] and [* * *], members, plus [* * *], a non-voting advisor. Shivers Aff. ¶ 7. [* * *] and [* * *] were the two Contracting Officer's Technical Representatives, and, along with [* * *], worked in the Department's Justice Management Division on the Facilities and Administrative Services Staff, which was responsible for the administration of the contract and procurement at issue. *Id.*

Pitney Bowes contends that the destruction of the individual panel members' rating sheets was wrongful and provides cause for discovery of the panel members in an effort to reconstruct their rating sheets. *See* Hr'g Tr. 18:10 to 19:1 (May 14, 2010). Additionally, Pitney Bowes contends that the destruction of the panel members' rating sheets ties into the bias claim because deposing the panel members would provide evidence regarding whether or not [* * *] "skewed or otherwise improperly influenced either their evaluations or the reporting of their evaluations." Hr'g Tr. 17:20 to 18:6 (May 14, 2010).

The government responds that "the solicitation and the plan for the procurement noted that there would be individual reviews of the proposals by the individual members of the TEP," but that "[t]hey may or may not write individual evaluation forms." Hr'g Tr. 20:21–25 (May 14, 2010). "It was recommended, but it was stated in the solicitation that it wasn't a requirement." Hr'g Tr. 21:1–3 (May 14, 2010). Consequently, the government argues that the individual members' rating sheets were regarded as drafts be-

---

disbelief ... [and] appeared to be upset and disappointed that Pitney Bowes decided not to

partner with BrigthtKey' ") (quoting Rooney and Miller Affs. ¶ 13).

cause they were not required. Hr'g Tr. 21:14–21 (May 14, 2010).

The FAR provisions cited in Mr. Shivers' affidavit specify requirements for maintaining "Government Contract Files." 48 C.F.R. ("FAR") Subpart 4.8 (heading). FAR Subpart 4.8 "prescribes requirements for establishing, maintaining, and disposing of contract files." FAR § 4.800. Section 4.801 requires each governmental office performing contracting functions to "establish files containing the records of all contractual actions ... *sufficient to constitute a complete history* of the transaction." FAR § 4.801(b) (emphasis added). The history shall "[p]rovid[e] a complete background as a basis for informed decisions at *each step in the acquisition process ... [and] [f]urnish[ ] essential facts in the event of litigation* or congressional inquiries." FAR § 4.801(b)(1), (4) (emphasis added). "A contract file should generally consist of ... [materials] that document[ ] the basis for the acquisition and the award." FAR § 4.802(a). Examples of records normally contained in contract files respecting acquisition include "[s]ource selection documentation." FAR § 4.803(13). These provisions are of long standing and have remained essentially unchanged since their adoption.

By way of regulatory history, FAR Subpart 4.8 was issued in 1983 as part of the original promulgation of the FAR. *See* 48 Fed.Reg. 42,102 (Sept. 19, 1983) ("The FAR, together with agency supplemental regulations, replaces the current Federal Procurement Regulations System, the Defense Acquisition Regulation, and the NASA Procurement Regulation" and "establishes ... a single regulation for use by all Executive agencies in their acquisition of supplies and services with appropriated funds."); *id.* at 42,116–119 (setting out the text of FAR Subpart 4.8). The Subpart has as its antecedent Section 1–1.313 of the Federal Procurement Regulations, established in March 1959, 24 Fed.Reg. 1,933, 1,941 (Mar. 17, 1959), republished in 1964, which provides:

> Each contract file should contain documentation of actions taken with respect to each contract, including final disposition. To the extent that retained copies of documents do not represent all actions taken, suitable memoranda or a summary statement of such undocumented actions should be prepared promptly and be retained in the contract file.

29 Fed.Reg. 10,102, 10,112 (July 24, 1964).

Contrary to Contracting Officer Shivers' position, the destruction of the individual TEP members' score sheets is barred by the FAR provisions. The current contract file for the challenged procurement does not "constitute a *complete* history of the transaction," FAR § 4.801(b) (emphasis added), nor does it "[f]urnish[ ] essential facts in the event of litigation." FAR § 4.801(b)(4). FAR § 4.801(b) expressly refers to § 4.803, which provides "examples of the records normally contained ... in contract files." FAR § 4.803. Specifically, the record as submitted does not contain all "[s]ource selection documentation," as required by FAR § 4.803(a)(13). It was foreseeable that the individual rating sheets could well become relevant to issues arising in a bid protest, particularly in a situation where, as here, the bias of one or more of the panel members is alleged. No preternatural clairvoyance would be required to envision that possibility. Although the ratings of the individual members of the TEP presumably were taken into account by, and wrapped into, the consensus report of the TEP, without the separate score sheets of the individual panel members, the court is unable to assess any divergence in the ratings which produced that consensus, or in turn, determine whether there existed personal bias in favor of BrightKey and Stanley on the part of one or more of the panel members. The argument by the government and the intervenor that the individual members' rating sheets were in effect no more than drafts of the final consensus report of the Technical Evaluation Panel is not supportable. The consensus report necessarily represented an amalgam of the views of the panel members and would have tended to suppress individual views. Moreover, Mr. Shivers understood that the individual members' rating sheets had an existence and standing independent of the consensus report. Among other things, Mr.

Shivers' affidavit states his belief "that the TEP prepared three drafts before finalizing its consensus report." Shivers Aff. ¶ 13.[6] The drafts of the TEP consensus report thus had a separate existence from the rating sheets prepared by the individual panel members. In short, the destruction of the individual panel members' rating sheets contravened the FAR.[7]

 Contracting Officer Shivers' destruction of the rating sheets raises issues of spoliation of evidence. " 'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *See United Med. Supply Co. v. United States*, 77 Fed.Cl. 257, 263 (2007) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)). Spoliation may result in sanctions, either based on the court's inherent authority to control the judicial process or grounded in contravention of specific discovery or document-preservation orders. *Id.* at 264. The oldest and most typical remedy for spoliation is the drawing of an "adverse inference" that the destroyed evidence would have been favorable to the opposing side. *Id.* at 263. There is a division of authority on the issue of whether a showing of "bad faith" is an indispensable element of the spoliation doctrine, which divergence in precedents was discussed at length in *United Medical Supply. Id.* at 264–71. There, in the absence of any direct Federal Circuit precedent on the issue outside the context of patent cases, in which the Circuit applies the law of the relevant regional circuit, the court concluded that " 'bad faith' need not be shown in order to impose even the most severe of the spoliation sanctions authorized by RCFC 37(b) and (d)," or to impose spoliation sanctions under the court's inherent authority. *Id.* at 268; *but see Jandreau v.*

*Nicholson*, 492 F.3d 1372, 1376 & n. 3 (Fed. Cir.2007) (raising, but not deciding, the question of whether negligent, as contrasted to bad faith, destruction of documents can give rise to an adverse inference, and noting a conflict amongst the circuits). However, it is unnecessary to address that issue at this juncture. Pitney Bowes specifically disavows any claim that the contracting officer acted in bad faith in ordering the destruction of the individual panel members' rating sheets. Hr'g Tr. 22:3–24, 50:6–13 (May 14, 2010). Nonetheless, Pitney Bowes has made a sufficient showing of a violation of the record-keeping provisions of FAR Subpart 4.8 to support ordering limited deposition testimony of the individual panel members for the purpose of reconstructing what their individual ratings were prior to the development of the TEP's "consensus" report.

## CONCLUSION

The motions to supplement the administrative record of the procurement at issue are GRANTED IN PART and DENIED IN PART. For purposes of supplementing the administrative record, the court will allow depositions to be taken of Contracting Officer Shivers, the members of the Technical Evaluation Panel—[* * *], [* * *], and [* * *]—and the nonvoting advisor to the panel, [* * *]. The depositions shall each be limited to ninety (90) minutes in length and shall be conducted on or before June 10, 2010.

The court also GRANTS the government's implicit motion to supplement the administrative record with the e-mails set out as attachments to the [* * *] and Shivers Affidavits.

It is so ORDERED.

---

**6.** Pitney Bowes raises no claim that these drafts of the consensus report should have been preserved in the contract file included in the administrative record.

**7.** The government and the intervenor cite the decision in *Gulf Group Inc. v. United States*, 61 Fed.Cl. 338 (2004), as support for their positions. *See* Hr'g Tr. 23:18 to 24:22 (May 14, 2010). However, that case is distinguishable because it

addressed, and rejected, a claim that drafts of documents were discoverable and should be made part of the administrative record in a bid protest where the record already contained the final documents. *See Gulf Group*, 61 Fed.Cl. at 347–48. Here, Pitney Bowes questions the destruction of the panel members' original rating sheets, not drafts of the consensus report.