**MONTANA FISH, WILDLIFE, AND PARKS FOUNDATION, INC.,**
Plaintiff,

v.

**UNITED STATES of America, Defendant.**

No. 09–568C.

United States Court of Federal Claims.

Jan. 11, 2010.

Richard F. Gallagher, Church, Harris, Johnson & Williams, P.C., Great Falls, Montana, for plaintiff. With him on the briefs and at the hearing were Gregory R. Schwandt and Michael P. Talia, Church, Harris, Johnson & Williams, P.C., Great Falls, Montana.

Austin M. Fulk, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Gerald R. Moore, United States Department of the Interior, Office of the Solicitor, Rocky Mountain Region, Billings, Montana.

## OPINION AND ORDER

LETTOW, Judge.

This unusual action combines a pre-award bid protest with a claim for damages under the Contract Disputes Act, 41 U.S.C. §§ 601–613. At issue is a contract between the United States Department of Interior, Bureau of Reclamation (the "Department"), and the Montana Fish, Wildlife, and Parks Foundation (the "Foundation") for the administration of the Montana Fish and Wildlife Conservation Trust (the "Trust"). Compl. ¶ 1. The Foundation alleges that the Department has breached the Trust Agreement by attempting to terminate the Foundation as trustee of the Trust through the implementation of a unilateral amendment to the Trust Agreement, followed by the government's solicitation of offers to serve as a replacement trustee. *Id.* at ¶¶ 1, 47, 68. In its protest, the Foundation has asked the court to (i) enjoin the government from soliciting proposals for a new manager of the Trust, and (ii) issue a declaratory judgment that the unilateral changes made to the Trust Agreement by the government are invalid. Compl. at 19 (Prayer for Relief ¶¶ 1–2). Additionally, the Foundation seeks money damages for breach of the Trust Agreement, averring that the contracting officer has issued a decision in accord with the Contract Disputes Act that provides a jurisdictional predicate for its contractual claim. Compl. at 20 (Prayer for Relief, ¶ 5); *see also id.* ¶ 67. The action was filed on August 27, 2009. A hearing on plaintiff's application for a temporary restraining order was held the next day, on August 28, 2009. At the hearing, the government agreed to stay both its solicitation for a new trustee [1] and its amendment to the Trust

---

1. The Foundation consistently refers to its role as that of "trustee," *see, e.g.,* Pl.'s Br. in Support of Mot. to Supplement the Administrative Record at 2 ("Pl.'s Br."), while the government regularly uses the term "trust manager" to describe the Foundation's responsibilities. *See, e.g.,* Def.'s Resp. to Pl.'s Mot. for Leave to Supplement the Administrative Record at 1 ("Def.'s Opp'n"). The court uses both terms in this opinion, and, by doing so, neither signals that any material difference exists between the two divergent de-

Agreement. Hr'g Tr. 5:23–25, 7:6–11 (Aug. 28, 2009) ("Aug. Hr'g Tr."). In light of the government's agreement, the parties stipulated that plaintiff's application for a temporary restraining order had become moot. Aug. Hr'g Tr. 9:1–10.

In accord with the court's order issued on August 28, 2009, the day of the hearing on temporary relief, the government filed the administrative record in this case on September 30, 2009 pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"). The parties subsequently discussed supplementing the administrative record relating to the termination and new solicitation but were unable to reach an agreement in that regard, and the Foundation filed a motion to supplement the administrative record on October 21, 2009. *See* Pl.'s Mot. to Supplement. The government responded to the Foundation's motion by opposing supplementation, arguing that the documents sought to be added to the administrative record either do not exist or were not considered by the agency in reaching its decision to terminate the Trust and solicit offers for a replacement trustee. Def.'s Opp'n at 1.

Reflective of the procedural complexity of this case, the government has filed motions to stay the filing of its answer pending briefing and resolution by the court of motions related to the pre-award bid protest, *see* Def.'s Mot. to Stay the Filing of its Answer at 1–2 ("Def.'s Mot. to Stay"), and to bifurcate the proceedings in this case into bid-protest and, if necessary, contract phases. *See* Def.'s Mot. to Bifurcate at 1. The Foundation opposes these motions on two grounds: (1) that the administrative record fails to address all of the claims in the complaint, and (2) that the bid-protest and con-

tractual claims are so intertwined that the bid protest cannot be resolved without addressing the merits of the contract claim. Pl.'s Resp. to Mot. to Stay Filing of Answer at 1 ("Pl.'s Opp'n to Def.'s Mot. to Stay"). The several motions have been fully briefed and a hearing was held on December 18, 2009.

### BACKGROUND[2]

In 1998, as Title X of the Omnibus Consolidated and Emergency Appropriations Act, Congress passed the Canyon Ferry Reservoir, Montana, Act, Pub.L. No. 105–277, §§ 1001–1009, 112 Stat. 2681–710 (1998), *amended at* Pub.L. No. 106–113 §§ 401–405, 113 Stat. 1501A–307 (1999). *See* AR 1–9 (Canyon Ferry Reservoir, Montana, Act (the "Act")).[3] Section 1007 of the Act directs "[t]he Secretary [of the Interior], in consultation with the [Montana] congressional delegation and the [g]overnor of [Montana], [to] establish a nonprofit charitable permanent perpetual public trust." AR 6 (Act, § 1007(a)). The Trust was to be funded through the sale of federally owned cabin sites along the Canyon Ferry Reservoir to private parties, and the funds obtained were to be used to acquire new public lands for fish and wildlife conservation purposes. AR 2 (Act, § 1002).[4] The Act provided that "[t]he Trust shall be managed by a trust manager," who shall, among other obligations, "be responsible for investing the corpus of the Trust." AR 6 (Act, § 1007(c)(1)).

On December 19, 2001, the Department posted a notice in Commerce Business Daily soliciting proposals for a manager of the Trust. Compl. ¶ 20. The Foundation responded to the solicitation, submitting a bid to serve as trust manager in exchange for a

scriptive terms nor offers any view on the merits of the case.

2. The recitations that follow are drawn from the pleadings, the administrative record, the motions and briefs of the parties, and the representations made by counsel at the hearings. The recitations do not constitute findings of fact under either RCFC 52(a) or 52.1.

3. References to the administrative record will be to "AR___."

4. The purpose of the Trust is specified in the Act as: "to provide a permanent source of funding to acquire publicly accessible land and interests in land, including easements and conservation easements, in the State from willing sellers at fair market value to—(1) restore and conserve fisheries habitat, including riparian habitat; (2) restore and conserve wildlife habitat; (3) enhance public hunting, fishing, and recreational opportunities; and (4) improve public access to public land." Act, § 1007(b).

total fee of 1.25% of the market value of the trust assets on an annual basis, assessed quarterly. Compl. ¶¶ 22–23. The Foundation avers that its bid was "based on an understanding that the term of the [c]ontract was [to be] perpetual." Compl. ¶ 26. The Foundation was awarded the contract, and on June 5, 2002, the Department and the Foundation entered into the Trust Agreement. AR 26–32 (Trust Agreement (June 5, 2002)). Notably, the Trust Agreement does not contain an end date or a termination-for-convenience clause. *See id.*[5] However, Section 6.2 of the Trust Agreement grants the government, as trustor, the right to amend the Trust unilaterally "to more fully accomplish the trust purposes." *Id.* at 31.

The Foundation avers that the government is bound by Section 6.3 of the Trust Agreement to comply with Montana trust and contract law and that it has failed to do so. Compl. ¶¶ 35–36. This Section, titled "Situs," mandates that "all questions relating to performance [under the Trust] shall be adjudged and resolved in accordance with the laws of the [S]tate of Montana." AR 31 (Trust Agreement). The government addressed the issue of what law applies during the hearing in December, arguing that the court should apply "federal procurement law," or the common law of contracts assembled in the Restatement of Contracts. *See* Dec. Hr'g Tr. 10:20 to 12:22. What body of laws the court should apply in addressing the merits of plaintiff's claims is an open question that the court need not resolve at this juncture.

The government concedes that "the Foundation was for the most part successful in accomplishing the purposes of the [Trust]." Def.'s Opp'n at 2. However, according to the government, concerns were raised that the Foundation was receiving too much compensation under the terms of the Trust Agreement, and, in response, the Assistant Secretary of the Interior appointed a steering group to review the Trust. *Id.* In September 2005, a field team appointed by the steering group issued a report to the Secretary of the Interior. *See* AR 39–83 (Field Team Report (Sept.2005)). The report recommended that the Secretary consider amending the Trust Agreement "as needed to more fully accomplish the trust purposes." *Id.* at 42. The report also recommended that an interagency steering group be established as a designated point of contact for the Secretary on the regional level. *Id.* at 41. In accord with these recommendations, an interagency steering group denominated the "Director's Working Group" was established in 2006, and that group issued its first annual report in March of 2007. AR 250–87 (Director's Working Group Annual Report (Mar. 7, 2007)).[6]

On July 12, 2007, Senator Max Baucus from Montana requested that the Department of the Interior, Office of the Inspector General, initiate a review of the Trust. AR 351–52 (E-mail forwarding letter from Senator Baucus to Department requesting review of Trust (July 17, 2007)). The Office of the Inspector General conducted the requested

---

**5.** During the hearing held on December 18, 2009, the government invoked what is often referred to as the *Christian* doctrine to justify termination of the Trust Agreement. *See* Hr'g Tr. 14:23 to 15:5 (Dec. 18, 2009) ("Dec. Hr'g Tr."). In *G.L. Christian & Assocs. v. United States*, the Court of Claims held that a termination-for-convenience clause should be read into a fixed-price construction contract because the then-extant Armed Services Procurement Regulations required the clause to be included in the contract. 160 Ct.Cl. 1, 312 F.2d 418 (1963), *aff'd on reh'g*, 160 Ct.Cl. 58, 320 F.2d 345 (1963). This court has interpreted *Christian* in divergent ways. *Compare Enron Fed. Solutions, Inc. v. United States*, 80 Fed.Cl. 382, 392 n. 11 (2008) (stating the *Christian* doctrine "provides that mandatory federal regulations should be read into a government contract, even if not physically included or

incorporated by reference therein"), *with Advanced Team Concepts, Inc. v. United States*, 77 Fed.Cl. 111, 113 (2007) ("Under the *Christian* [d]octrine, a termination for convenience clause must be read into any government contract."). How, if at all, the *Christian* doctrine applies to this case goes to the fundamental question of whether the government's actions of amending the Trust Agreement to terminate it and soliciting a new trustee (or trust manager) under a new trust agreement were lawful. That question is properly left for trial or other disposition of the merits of the Foundation's claims.

**6.** Of significance regarding later events, Michael Ryan, Regional Director, Great Plains Region, Bureau of Reclamation, was named the Leader of the Director's Working Group. *See* AR 250.

review, and the Inspector General issued a memorandum setting out his recommendations to the Secretary of the Interior on August 7, 2008. AR 704–13 (Mem. from Earl E. Devaney, Inspector General (Aug. 7, 2008)). The Inspector General's memorandum recommended, among other things, that the Trust Agreement with the Foundation be terminated. *Id.* at 705. Over the course of the next year, the government negotiated without success with the Foundation for a mutually acceptable amended trust agreement. Def.'s Opp'n at 4. Then, on January 5, 2009, the government unilaterally amended the Trust Agreement to establish a contractual termination date of December 31, 2009. AR 1215–19 (Letter from Michael Ryan, Regional Director (Jan. 5, 2009)) (transmitting a unilateral amendment to the Trust Agreement also dated Jan. 5, 2009 and signed by Michael Ryan as contracting officer). By letter dated May 22, 2009, the Foundation challenged the legal basis for the amendment. AR 1249–50 (Letter from Richard F. Gallagher of Church, Harris, Johnson & Williams, P.C., representing the Foundation, to Ryan (May 22, 2009)). On July 27, 2009, Mr. Ryan, acting in three roles, Regional Director, Chairman of the Director's Working Group, and contracting officer, issued a final decision on the matter under the Contract Disputes Act, determining that the "Trust Agreement amendment was an appropriate exercise of the [government's] authority under [S]ection 6.2 of the Trust Agreement and applicable law." AR 1267–70 (Final decision of contracting officer (July 27, 2009)). Thereafter, on August 3, 2009, the government issued Solicitation No. 09SQ6000FW, seeking proposals from entities interested in competing for a contract to manage the Trust. AR 1271–72 (Solicitation No. 09SQ6000FW (Aug. 3, 2009)) (listing Chandler Worley as contracting officer). The Foundation filed this action on August 27, 2009.

## STANDARDS FOR DECISION

■ When considering a bid protest, the court adheres to "the standards set forth in section 706 of title 5," *i.e.*, the section of the Administrative Procedure Act ("APA") that prescribes the scope of judicial review of agency actions. 28 U.S.C. § 1491(b)(4). Under the APA, the court may set aside an agency decision if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "As a general rule, in determining whether an agency's actions are arbitrary or irrational, the 'focal point for judicial review . . . should be the administrative record already in existence, not some new record made initially by the reviewing court.'" *Knowledge Connections, Inc. v. United States,* 79 Fed.Cl. 750, 759 (2007) (quoting *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (which in turn quoted *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973))). However, the administrative record is in many ways "a fiction." *See CCL Serv. Corp. v. United States,* 48 Fed.Cl. 113, 118 (2000) (commenting that in a bid-protest case, the administrative record is not "a documentary record maintained contemporaneously with the events or actions included in it[,][but][r]ather, the administrative record is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court").

■ Motions to supplement the administrative record in bid-protest actions in this court are governed by the Federal Circuit's recent decision in *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374 (Fed.Cir.2009). "[S]upplementation of the [administrative] record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id.* at 1380 (quoting *Murakami v. United States,* 46 Fed. Cl. 731, 735 (2000), *aff'd,* 398 F.3d 1342 (Fed. Cir.2005)). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Id.* at 1380 (quoting *Murakami,* 46 Fed.Cl. at 735, and citing *Florida Power & Light,* 470 U.S. at 743–44, 105 S.Ct. 1598; *Camp v. Pitts,* 411 U.S. at 142, 93 S.Ct. 1241). However, to perform an effective review pursuant to the APA, the court must have a record containing the information upon which the agency

relied when it made its decision as well as any documentation revealing the agency's decision-making process. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("[S]ince the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence[,] it may be necessary for the [d]istrict [c]ourt to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard."), *abrogated in an unrelated respect by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (APA does not constitute an implied grant of subject-matter jurisdiction to review agency actions); *see also Kerr Contractors, Inc. v. United States,* 89 Fed.Cl. 312, 335 (2009).

## ANALYSIS

This case is unusual in two respects: first, the Foundation has pursued both a bid-protest claim and a claim pursuant to the Contract Disputes Act against the government;[7] and second, at the root of both claims is the question whether the government has acted lawfully in amending the Trust Agreement to set a termination date. *See* Dec. Hr'g Tr. 19:23 to 20:3.

### A. *Subject Matter Jurisdiction*

 "Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action." *OTI Am., Inc. v. United States,* 68 Fed.Cl. 108, 113 (2005) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Subject matter jurisdiction may be challenged at any time by the parties or by the

court *sua sponte,* even on appeal. *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir. 1993). As plaintiff, the Foundation bears the burden of establishing that this court has jurisdiction to hear its claims. *See McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

The Tucker Act grants this court "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).[8] In causes of action brought under Section 1491(b), the court is empowered to award "any relief that the court considers proper, including declaratory and injunctive relief" except that monetary relief is limited to an award of "bid preparation and proposal costs." *Id.* § 1491(b)(2). Provisions of the Tucker Act also grant this court jurisdiction "to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract … on which a decision of the contracting officer has been issued under section 6 of that Act." *Id.* § 1491(a)(2). The primary relief available in causes of action brought under Section 1491(a) consists of monetary damages, although the court has authority to issue certain types of equitable relief where such relief is "an incident of and collateral to" an appropriate monetary award. *Id.* § 1491(a)(2); *see Bobula v. Unit-*

---

7. The court has become familiar with two other cases implicating both bid-protest and breach-of-contract issues. *American Ordnance LLC v. United States,* 83 Fed.Cl. 559 (2008), was a case brought under the Contract Disputes Act that functioned as a bid protest. In that case a contractor disputed ownership of manufacturing equipment located at an Army ammunition plant operated by the contractor, which equipment the government wanted to provide as "government-furnished property" in a new competitive acquisition. *See id.* at 561. In the second recent case, *Digital Techs., Inc. v. United States,* 89 Fed.Cl. 711 (2009), the plaintiff was forced to bring a

breach-of-contract claim where a bid-protest action was not jurisdictionally viable. *See id.* at 722–23, 730 (finding that plaintiff's allegations fell within the court's "[Contract Disputes Act] jurisdiction," but that plaintiff would have been prohibited by statute from asserting a bid-protest claim).

8. Section 1491(b) was added to the Tucker Act by the Administrative Disputes Resolution Act of 1996 to replace the former Section 1491(a)(3). Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874 (1996).

ed States Dep't of Justice, 970 F.2d 854, 859 (Fed.Cir.1992).

In its complaint, the Foundation relies upon the court's bid-protest jurisdiction to put forward objections to the government's solicitation for a new trust manager and to request that that solicitation be enjoined. Compl. ¶¶ 1, 71–85 (Counts I and II). Pre-award bid-protest jurisdiction is proper under Section 1491(b)(1) because the Foundation contests the Department's solicitation of proposals for a replacement trustee. The court's jurisdiction under the Contract Disputes Act is invoked by the Foundation's assertion of a right to monetary relief for alleged breaches of the Trust Agreement. Compl. ¶¶ 93–102 (Counts IV and V). Because the Foundation brings this action as an appeal of "the final decision of the [c]ontracting [o]fficer" respecting whether the government acted lawfully when it amended the Trust Agreement to terminate the Foundation as trust manager as of December 31, 2009, see AR 1267–70 (Final decision of the contracting officer), the necessary prerequisite for bringing an action in this court pursuant to the Contract Disputes Act has been satisfied. See 41 U.S.C. § 609(a)(1). Indeed, the government does not dispute that the court has jurisdiction over the Foundation's claims, only that the court should address the bid-protest component independently and before turning to the Foundation's contract claims. See Def.'s Mot. to Bifurcate at 1.

### B. Motion to Stay Filing of Answer and Related Motion to Bifurcate

In moving to stay the filing of its answer to the Foundation's complaint, the government argues that "the [disposi]tion of motions for judgment on the administrative record will resolve most, if not all, of the issues at stake in this matter[,] [and so] it would be an inefficient use of the [g]overnment's time and resources to file an answer [before the court addresses such motions]." Def.'s Mot. to Stay at 2. The government's related motion to bifurcate the proceedings in this case also requests that the court address the bid-protest aspects of the Foundation's complaint first, and then, only if necessary, turn to the issue of whether the Foundation is entitled to monetary damages under the Contract Disputes Act. Def.'s Mot. to Bifurcate at 1.

■ The government's motions reflect customary practice in purely bid-protest actions. In such cases, ordinarily "no purpose is served" in requiring the government to answer the complaint because "[t]he administrative record comprises the metes and bounds predicate to the court's resolution of the merits of [the case]." Infrastructure Def. Techs., LLC v. United States, 81 Fed.Cl. 375, 402 (2008). However, the Foundation contends that this case does not fit the accustomed pre-award bid-protest paradigm and opposes both motions, arguing that it would be impossible to resolve the bid-protest claim without addressing the merits of the contract claim because the two claims "are sufficiently intertwined." Pl.'s Opp'n to Def.'s Mot. to Stay at 1.

■ The Foundation has the more persuasive position in this argument. The question whether the government's actions to remove the Foundation as trustee as of December 31, 2009 were lawful is at the heart of both the Foundation's bid-protest claim and its claim for damages under the Contract Disputes Act. See Dec. Hr'g Tr. 7:20 to 8:9, 10:20 to 12:22.[9] Here, because

---

9. At the hearing, the parties acknowledged the relationship of the termination to each of the Foundation's claims. For example:

The court: ... [T]he court was interested in hearing your views on why the answer ought to be stayed and the case bifurcated to let the bid protest proceed first primarily because if the government had the right to terminate the existing trust agreement then the solicitation presumably would be proper, but if it didn't have the right then the solicitation would be improper. Do you have views?

[Counsel for the government]: Yes, Your Honor. I think those two questions are wrapped up together. Whether or not the government can properly terminate the trust agreement is wrapped up with the issue of whether or not it can properly resolicit for a new manager of the trust services. Dec. Hr'g Tr. 7:21 to 8:9. See also Def.'s Reply to Pl.'s Resp. to Motion to Bifurcate at 1 ("Both parties believe that this [c]ourt should first address the fundamental legal question of whether the [g]overnment may legally amend the contract at issue in this case to establish a termination date and resolicit for a new trust manager.").

the resolution of both claims turns on a single underlying question, it would be inappropriate to bifurcate the proceedings in the manner requested by the government. However, at the hearing in December, the government proffered an alternative means of bifurcation. While acknowledging the practical consideration that both of the Foundation's claims have the same root, the government emphasizes that the court could consider the merits of the salient question regarding termination without proceeding further to address damages. *See* Dec. Hr'g Tr. 8:10–22, 19:4–22. This alternative argument by the government has merit. The common element of the Foundation's claims concerns the validity of the government's purported termination and does not extend to damages for breach of contract. Accordingly, the government's motion to stay the filing of its answer is denied, and its motion to bifurcate is denied insofar as a determination of liability on the Foundation's claims is concerned. Proceedings on liability respecting both the Foundation's bid-protest and contractual claims will go forward concurrently. However, the motion to bifurcate is granted insofar as damages on the contractual claim are concerned. Damages will be addressed at a later stage of this case, assuming such consideration proves to be necessary. The government shall file an answer or other response to the Foundation's complaint on or before January 29, 2010.

### C. *Motion to Supplement the Administrative Record*

The Foundation's motion to supplement the administrative record filed by the government in this case requests the inclusion of five additional categories of documents: (1) "[f]iles maintained by the Department of the Interior Office of the Inspector General relating to that office's investigation into the Foundation's service as trustee of the [Trust]"; (2) documents, including notes and previous versions, related to the drafting of the Trust Agreement; (3) "documents reflecting the rates charged, and the services provided in return for those rates, by the trustees of other trusts or potential candidates for successor trustee of the [Trust]"; (4) "[t]he Solicitor's Opinion on the 'federal

money issue'"; and (5) "[a]ny termination for cause letter drafted by [the] contracting officer." Pl's Mot. to Supplement at 1–2. The government opposes the Foundation's motion, averring that the requested documents "either do[ ] not exist, or [were] not considered by the decisionmaker in deciding to amend the Foundation's contract for trust management services and to issue a [solicitation] for proposals to manage the [Trust]." Def.'s Opp'n at 1.

■ The court's rules require the government to file an administrative record where such a record is pertinent to the court's resolution of a case in whole or in part. *See* RCFC 52.1(a) ("When proceedings before an agency are relevant to a decision in a case, the administrative record of those proceedings must be certified by the agency and filed with the court."); *see also* RCFC 52.1 Rules Committee Note (2006 Adoption) ("Cases filed in this court frequently turn only in part on action taken by an administrative agency. In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings."). The parties have disputed whether the Department's officials responsible for the termination and new solicitation gave consideration to materials in each of the Foundation's five categories, and also whether the exception permitting supplementation, *i.e.*, where "'the omission of extra-record evidence [would] preclude[ ] effective judicial review,'" applies. *Axiom*, 564 F.3d at 1380 (quoting *Murakami*, 46 Fed.Cl. at 735).

#### 1. *The Inspector General's files.*

■ The first category of documents sought to be added to the record by the Foundation consists of files maintained by the Office of the Inspector General relating to the Inspector General's investigation of the Foundation as trustee of the Trust. Pl.'s Mot. to Supplement at 1. The Foundation avers that "the Inspector General's files are necessary to explain what evidence was before the Department regarding the Founda-

tion's performance as trustee of the Trust." Pl.'s Br. at 6. As described previously, *see supra*, at 5, in July of 2007, the Office of the Inspector General was asked to initiate a review of the Trust, AR 351–52 (E-mail forwarding letter from Senator Baucus to Department requesting review of Trust (July 17, 2007)), and in August of 2008, the Office submitted a memorandum of its findings and recommendations to the Secretary of the Interior. AR 704–13 (Mem. from Earl E. Devaney, Inspector General (Aug. 7, 2008)). The existing record establishes that Mr. Ryan, acting in his roles as Regional Director and contracting officer, did consider the Inspector General's memorandum when he decided to amend the Trust Agreement to establish a termination date and then caused a solicitation to be issued for a new trust manager, and thus that document is properly part of the administrative record. *See* AR 1267–70 (Final decision of contracting officer). Nonetheless, according to the government, the files maintained by the Office of the Inspector General relating to this memorandum were not themselves considered by Mr. Ryan respecting the termination or by Mr. Worley as the contracting officer for the new solicitation, and the government avers that "to this day [Mr. Ryan] has not seen the working papers and other materials underlying the Inspector General's report that called for the Foundation to be removed as Trust Manager." Def.'s Opp'n at 8. However, Mr. Ryan, in his roles as Leader of the Director's

Working Group and as Regional Director, necessarily would have had communications with the Office of Inspector General prior to receiving the Inspector General's report and recommendations. Accordingly, the Inspector General's files should be part of the administrative record in the bid-protest action.

Notably, the files also constitute discoverable matter for purposes of the Foundation's claim under the Contract Disputes Act.[10] In the unusual circumstances of this case, materials producible in discovery for the claim under the Contract Disputes Act that relate to the termination may legitimately be adduced as part of the parties' presentations of evidence regarding the legal propriety of the termination, whether or not they constitute part of the administrative record of the termination and new solicitation. Concededly, the propriety of the termination is the key question for both the bid-protest claim and the claim under the Contract Disputes Act, and measures that are procedurally appropriate *vis-à-vis* either claim may be employed to bring relevant evidence to the court's attention in that regard. The court's rule requesting the filing and use of administrative records, RCFC 52. 1, allows for, rather than forecloses, such consideration in the atypical situation presented by this case. In effect, a similar procedural route was adopted in the *American Ordnance* case, where a dispute over the ownership of equipment used in manufacturing munitions arose respecting a claim under the Contract Disputes Act, but

---

10. Particularly with respect to discoverable matter, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." RCFC 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* This standard mirrors that of Fed.R.Civ.P. 26, as amended in 2000, and interpretation of that rule informs the court's analysis. *See* RCFC 83(a) ("[T]o the extent permitted by this court's jurisdiction," the RCFC "must be consistent with the Federal Rules of Civil Procedure."); 2002 Rules Committee Note, Rules of the United States Court of Federal Claims (stating that "interpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure"). The 2000 amendments to Fed.R.Civ.P. 26 narrowed the scope of discoverable material, limiting discovery as of right to matters relevant to the claim or defense of any party. "Prior to the 2000 amendments, the parties were entitled to discovery of any information that was not privileged so long as it was relevant to the 'subject matter involved in the pending action.'" 6 James Wm. Moore, *Moore's Federal Practice* § 26.41[2][a] (3d ed.2003) (quoting Fed.R.Civ.P. 26(b)(1) (1983)). Under the current standard, a court should "focus on the specific claim or defense alleged in the pleadings." *Id.* (citing Fed.R.Civ.P. 26(b)(1) advisory committee note (2000 amend.)). A particular fact need not "be alleged in a pleading for a party to be entitled to discovery of information concerning that fact," *id.*, but the fact must be "germane to a specific claim or defense asserted in the pleadings for information concerning [the fact] to be a proper subject of discovery." *Id.*

the question of ownership also related to a planned competitive solicitation to use the equipment as "government-furnished property" in a new acquisition. *See American Ordnance*, 83 Fed.Cl. at 561. The court conducted a trial on an expedited basis to receive evidence concerning ownership of the equipment, and reached a determination based on that evidence, which determination resolved both the claims made under the Contract Disputes Act and the nascent bid protest dispute. *See* 83 Fed.Cl. at 562, 575. That approach, or a route closely akin to it, should have utility in the circumstances of this case.

### 2. *Original trust documents.*

■ The second category of documents sought to be added to the administrative record by the Foundation are documents related to the drafting of the Trust Agreement. Pl.'s Mot. to Supplement at 1. The Foundation avers that "[w]hether the trustee [of the Trust] has a duty to fundraise for the Trust appears to be one of the main reasons that [the] Department tried to remove the Foundation [as Trust Manager]," and "[d]ocuments [related to the] drafting of the original trust agreement are important to show what the Department anticipated asking ... potential trustees [about fundraising]." Pl.'s Br. at 7. The government opposes supplementing the administrative record with these documents, arguing that they are "irrelevant to this action" because the government "concede[s] that the Foundation was not required by its contract to engage in fundraising for the Trust" and regardless, they were not considered by Mr. Ryan in making his decision to amend the Trust to set a termination date. Def.'s Opp'n at 8–9.

Presumptively, documents related to drafting the Trust Agreement were not before Mr. Ryan when he made the decision to attempt to terminate the Foundation as trustee. However, any documents concerning the drafting of the Trust Agreement relate to the Foundation's claims under the Contract Disputes Act because they may bear on the intended scope of the duties the Foundation was expected by the government to perform, including fundraising duties, under the Trust Agreement, and they may similarly shed light on the intended duration of the Trust Agreement and whether removal of the trustee was contemplated. These issues go to the heart of the termination.

Accordingly, the Foundation's motion to supplement the administrative record is denied with regard to the original trust documents, but these documents are discoverable matter for purposes of the Foundation's contract claims.

### 3. *Information on rates charged by potential successor trustees.*

■ The third category of documents sought to be added to the administrative record by the Foundation includes "all documents reflecting the rates charged, and the services provided in return for those rates, by the trustees of other trusts or potential candidates for successor trustee of the [Trust]." Pl.'s Mot. to Supplement at 2. The Foundation avers that "[o]ne of the Department's alleged reasons for removing the Foundation as trustee of the Trust [was] that the Foundation [was] over compensated," Pl.'s Br. at 7, and therefore "whether the Department had actual evidence of the going rate for a trustee's services is essential to evaluate the rationality of [that] decision." *Id.* at 8. The government admits that "[o]ne of the factors that led to the [g]overnment's decision to amend the contract to establish a[ ] termination date was the belief that the Foundation charged excessive rates for the services that it provided." Def.'s Opp'n at 9. In this respect, counsel for the government represents that administrative officials performed "informal research," including "informal conversations with potential [t]rust managers and other [g]overnment officials who had experience in this field," but that no formal reports or analyses were generated. *Id.* at 9–10. The government argues that it received enough information to believe "in good faith" that if it issued a solicitation for a new trust manager, "it would receive offers that were more advantageous to it than the terms contained in the contract with the Foundation." *Id.* at 10.

Information the contracting officers acquired, even if by informal means such as oral conversations, which was available at the

time the decision was made to remove the Foundation as trustee, should be reflected in the administrative record. *See Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814 ("[S]ince the bare [administrative] record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the [d]istrict [c]ourt to require some explanation in order to determine ... if the Secretary's action was justifiable under the applicable standard."). In *Citizens to Preserve Overton Park*, the Supreme Court opined that "[t]he court may [even] require the administrative officials who participated in the decision to give testimony explaining their action. Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Id.* (citation omitted). Here, because the information sought is purely factual and does not involve analytical methodology or policy considerations, exploration of the mental processes of the pertinent administrative officials should not be necessary, and, in all events, should be avoided.

Accordingly, the Foundation's motion to supplement is granted with regard to information on the rates charged by potential successor trustees that was available to the contracting officers at the time the decision was made to terminate the Foundation as trustee and to embark on a new solicitation. This information may become part of the record in this case either through the use of discovery devices, *see* Dec. Hr'g Tr. 40:4–22, or through testimony presented at a trial.

4. *Solicitor's opinion.*

■■■ The Foundation also moved that a "Solicitor's Opinion on the 'federal money issue' " be added to the administrative record in this case. Pl.'s Mot. to Supplement at 2. The Foundation asserts that this opinion, mentioned in Mr. Ryan's personal notes on a meeting of the Director's Working Group held on July 12, 2007, *see* AR 340 (Ryan's notes of Director's Working Group meeting with the Citizen's Advisory Board (July 12, 2007)), addresses the fundraising dispute discussed *supra*. According to the Foundation, this document is "necessary for effective ju-

dicial review" because it may show that "fundraising was an afterthought used by the Department as an excuse to remove the Foundation [as trustee of the Trust]." Pl.'s Br. at 8–9. The government opposes the Foundation's request, averring that "[n]o such opinion exists." Def.'s Opp'n at 10.

At this point in the development of the case, the court cannot reject the Foundation's motion to include the "Solicitor's opinion" in the administrative record simply because the government represents that it does not exist. Presumptively, if the opinion did exist at the time the decision to terminate the Foundation was made, Mr. Ryan had access to it. The Foundation is entitled to explore whether such an opinion existed at the time Mr. Ryan decided to terminate the Foundation as trustee, and if so, in what form it existed. However, like the information on the rates charged by potential successor trustees, the opinion might have been given orally, in which instance, the Foundation would be entitled to have the opinion reduced to writing and made part of the record in this case through discovery or other appropriate means. Accordingly, the Foundation's motion to supplement the administrative record is granted with regard to the Solicitor's opinion.

5. *Termination-for-cause letter.*

■■■ The fifth and final document sought to be added to the administrative record by the Foundation is "[a]ny termination for cause letter drafted by [the] contracting officer ... to the extent that the letter purports to explain the Department's rationale and authority for issuing such a letter." Pl.'s Mot. to Supplement at 2. The handwritten notes of a Director's Working Group meeting, held on January 10, 2008, contain the following reference: "Termination for just cause [arrow] look to Chan Worley's write-up." AR 437 (Negotiation Topic, Director's Working Group meeting (Jan. 10, 2008)). The Foundation contends that "[i]f Chan Worley, a contracting officer, did in fact draft a letter to terminate the Foundation for cause then it should be included in the administrative record because it will explain what the Department thought the Founda-

tion was doing that could justify such a termination." Pl.'s Br. at 9. The government admits the document exists, but opposes its inclusion in the administrative record, arguing that it is "irrelevant to this protest" because the government "never made any effort to terminate the Foundation for cause," and the letter in any case, "is nothing more than the text of the termination for cause clause included in the Federal Acquisition Regulations (FAR)." Def.'s Opp'n at 10–11. At the hearing held on December 18, 2009, the government emphasized that the letter was written by Mr. Worley, who was not the "deciding official" with regard to the termination. Dec. H'rg Tr. 54:7–8. The government averred that it "[did] not believe Mr. Ryan ever actually saw this [letter]. It certainly was not something that he relied on in making his decision." Dec. H'rg Tr. 54:8–10. However, Mr. Worley shared at least some responsibilities with Mr. Ryan because Mr. Worley manifestly participated in the government's exploration of the termination and then subsequently was listed as the contracting officer for the new solicitation. Accordingly, the Foundation's motion to supplement the administrative record is granted with regard to the termination-for-cause letter.

## CONCLUSION

For the reasons stated, the government's motion to defer filing of its answer is DENIED. The government shall be afforded time from the date of the filing of this opinion and order within which to file its answer, such that its answer shall be due on or before January 29, 2010. The government's motion to bifurcate is DENIED with respect to a determination of the legal propriety of the termination of the Foundation as trustee, but GRANTED insofar as any proceedings to determine damages on the contractual claim are concerned. The Foundation's motion to supplement the administrative record is GRANTED IN PART and DENIED IN PART. The Foundation's motion to supplement the administrative record is GRANTED with regard to (i) the Inspector General's files, (ii) information about the rates of other professional trustees, (iii) the Solicitor's opinion, and (iv) the termination-for-cause letter.

The Foundation's motion to supplement the administrative record is DENIED with regard to the original trust documents, but those documents are discoverable matter under RCFC 26(b)(1) for purposes of the Foundation's claim under the Contract Disputes Act.

The parties shall file a joint status report setting out a plan and schedule to provide for expedited discovery related to the termination and for submission of cross-motions for summary judgment, or for trial, of the disputed issues respecting the termination. The proposed schedule should provide for completion of briefing of cross-motions or for trial no later than June 2010.

It is so ORDERED.