**TECH SYSTEMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 10–877C.**

United States Court of Federal Claims.

Filed under seal March 1, 2011.

Reissued March 9, 2011.[1]

---

1. The parties were given an opportunity to propose redactions, and agree that redactions are not necessary. The opinion is now released to be published in its original form.

James Scott Phillips, Centre Law Group, LLC, Vienna, VA, for plaintiff. Brian C. Caney, Eric S. Cruius, and Sarah C. Schauerte, all of Vienna, VA, of counsel.

Charles M. Kersten, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director, all of Washington, D.C., for defendant.

*MEMORANDUM OPINION AND ORDER*

WOLSKI, Judge.

Plaintiff Tech Systems, Inc. has moved to supplement the administrative record for its bid protest with six declarations of its officers and employees. The case concerns the award of a contract to perform fitting, tailoring and garment-pressing services at a United States Coast Guard ("USCG") training center. Plaintiff, the incumbent currently providing these services under a bridge contract, challenges the award to a competitor. Among the grounds for its protest are allegations that the facility manager of the training center, a USCG officer who formerly served as the Contracting Officer's Technical Representative ("COTR") for plaintiff's contract, was biased against plaintiff and favored the awardee. The declarations that Tech Systems would like to add to the record concern statements and actions of the facility manager that support the allegations of bias and bad faith. As explained below, the Court concludes that effective judicial review of these allegations necessitates adding the declarations submitted by plaintiff to the administrative record. Accordingly, the motion to supplement the record is **GRANTED.**

## I. BACKGROUND

The procurement decision at issue is the USCG's decision to award to Court House Cleaners ("CHC") an Indefinite–Delivery/Indefinite–Quantity contract to provide tailoring services at its Cape May, New Jersey Training Center. *See* Admin. R. at 650–66. Tech Systems is the incumbent contractor, operating under a bridge contract since the expiration of its initial 5–year contract. Compl. ¶ 5. It was one of three companies to make the competitive range for this procurement. *See* Admin. R. at 630. The award was apparently made to CHC in late October 2010. *See id.* at 665–67.

In this post-award bid protest, plaintiff contends that the USCG violated both the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253, and the Procurement Integrity Act ("PIA"), 41 U.S.C. § 423(a), and also breached the implied-in-fact contract to fairly consider all offerors' proposals. *See* Compl. ¶¶ 3, 60–63, 66–69, 72–74. Tech Systems challenges the past performance rating given to CHC, *id.* ¶¶ 56, 62(a); its technical performance rating and that of CHC, *id.* ¶¶ 17–26, 56, 62(b),(d); and the risk rating given to CHC. *Id.* ¶ 56, 62(c). Tech Systems argues that discussions were not meaningful, as it was not informed that the price it offered was not as competitive as the awardee's. *Id.* at 29, 32, 56, 62(e). It also alleges that its technical information was communicated to CHC, Compl. ¶¶ 57, 62(f), 73.

A large portion of plaintiff's complaint centers around the actions of the facility manager and former COTR, Chief Warrant Officer Jose Samaniego Jr. Tech Systems alleges that CWO Samaniego was removed from the COTR position "after numerous complaints relating to his belittling, demeaning, abusive and inappropriate behavior directed towards Tech Systems employees performing" the tailoring services contract. Compl. ¶ 41. Plaintiff alleges that during the "Industry Day" site visit of potential offerors at the USCG training center, the owner of CHC announced she was going to see CWO Samaniego, stressing that they were on a first-name basis, and then went down the hallway towards his office. *Id.* ¶¶ 39–41. Fifteen to twenty minutes later she allegedly rejoined

the others, now carrying a large stack of papers. *Id.* ¶ 42; *see also* Admin. R. at 470. The facility manager, among other things, is alleged to have made statements in the course of the procurement to the effect that Tech Systems would soon be leaving and that CHC's owner had won the contract, see Compl. ¶¶ 47, 50, and is alleged to have referred potential customers to CHC. *Id.* ¶ 48. On one occasion, he allegedly "shouted expletives" at Tech Systems's shop manager. *Id.* ¶ 47. Despite the facility manager's alleged "extreme dislike of Tech Systems and its employees," *id.* ¶ 46, he was not removed from the site by his direct supervisor-who also served as Chairman of the Technical Evaluation Team for the solicitation. *Id.* ¶ 52; *see* Admin. R. at 250. Tech Systems also alleges that the official who replaced CWO Samaniego as COTR for its contract works at an inconvenient distance from the training center and "has expressed his strong displeasure with this arrangement to Tech Systems personnel." Compl. ¶ 51.

Tech Systems contends that the CHC "owner's personal relationship with" the facility manager created an organizational conflict of interest, *id.* ¶ 68, and that the bias and bad faith of the latter led to violations of CICA and the PIA and a breach of the implied-in-fact contract to fairly and honestly consider all proposals. *See id.* ¶¶ 66–69, 72–74. To flesh out the allegations of bias and bad faith, plaintiff seeks to add to the administrative record six declarations of its employees and officers. *See* Mot. of Tech Sys. to Supp. Admin. R. ("Pl.'s Mot.") at 1–3. Chris Blethen, plaintiff's vice president, recounts being told in a phone call from a government worker at the Cape May facility that CWO Samaniego made the women at the tailor shop cry and that the facility manager boasted "he decides who wins the contract." Ex. A to Pl.'s Mot. The shop manager, Rosalind Spragg, states, *inter alia*, that CWO Samaniego told her on March 4, 2010 that plaintiff was "not going to win the contract"; threatened "[y]our day will come" when he was not able to press his uniform in their shop on May 3, 2010; stated during a September 2010 fire drill that Tech Systems

"will be out of here soon"; and was overheard on September 28, 2010 laughing on the phone that CHC's owner "won the contract" and "[t]hey'll be out soon." Ex. B to Pl.'s Mot. She also describes the Industry Day events. *Id.* ¶ 2(f).[2] One of plaintiff's tailors remembers hearing CWO Samaniego say to the shop manager during a spring fire drill that "[i]n another month you won't be here." Ex. C to Pl.'s Mot.

Another tailor recalls him saying, during the spring fire drill, "[a]t this time next month, there will be one less in this building." Ex. D to Pl.'s Mot. ¶ 2(a). She also frequently heard Coast Guard recruits as well as Company Commanders say they were told to take their clothes to CHC, and saw that only CHC's business cards were on display in the facility manager's office. *Id.* ¶ 2(b). Plaintiff's president, Nancy Blethen, explains that she was "often called directly to deal with problems that occur on site," and then repeats many of the claims made by plaintiff's employees. Ex. E to Pl.'s Mot. ¶¶ 3, 5. She adds that the Contract Specialist for the tailoring services contract told her that CWO Samaniego "in response to our formal complaint ... would no longer be acting as COTR once the main contract expired on April 17, 2010." *Id.* ¶ 5(e). Plaintiff's president also recounts that on September 29, 2010, the day after CWO Samaniego "proclaimed" that CHC had won the contract, she sent an e-mail to the Contract Specialist "about this startling pronouncement by someone (Mr. Samaniego) who seemingly had influence over the procurement process while the bids were still being evaluated." *Id.* ¶ 8. The USCG did not respond. *Id.* And finally, one of plaintiff's sewing machine operators states that a worker at the facility told her that CWO Samaniego instructed workers to refer potential customers to CHC, and also describes some recent instances of theft and vandalism suffered at the tailor shop. Ex F to Pl.'s Mot.

## II. DISCUSSION

■ Through the passage of the Administrative Dispute Resolution Act of 1996 ("ADRA"), Congress determined that bid

---

**2.** The shop manager also alleges that CWO Samaniego borrowed some of plaintiff's clothes racks to be used by the CHC owner for a garage sale, and was belligerent when told that Tech Systems needed them back. Ex. B to Pl.'s Mot. ¶ 2(b)–(c).

protests should be reviewed in our Court using the standards employed in Administrative Procedure Act ("APA") review. *See* 28 U.S.C. § 1491(b)(4) (referencing "the standards set forth in section 706 of title 5"). Courtesy of an apparent misreading of the legislative history, *see Gulf Group Inc. v. United States*, 61 Fed.Cl. 338, 350 n. 25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that informal agency decisions are to be reviewed under the APA's arbitrary and capricious standard, rather than de novo. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Although the administrative record for informal actions such as procurement decisions is widely recognized as something of a fiction, *see Orion Int'l Techs. v. United States*, 60 Fed.Cl. 338, 343 & n. 9 (2004), it is the "focal point of judicial review" in bid protests. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

■ As the Federal Circuit has recently underscored, the administrative record in a bid protest "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed.Cir.2009). One of the basic reasons a record may be insufficient is when it is missing "relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations." *Orion Int'l*, 60 Fed.Cl. at 343–44 (footnotes omitted).[3] The first of these examples in particular calls for extra-record evidence to support requests for supplementation or discovery. *See Beta Analytics Int'l, Inc. v. United States*, 61 Fed.Cl. 223, 226 (2004) (recognizing that otherwise record

supplementation will be insensibly limited "to cases involving officials who are both sinister *and* stupid"). But because of the presumptions of regularity and of good faith conduct, *see Tecom, Inc. v. United States*, 66 Fed.Cl. 736, 769 (2005), "to put facts relating to bad faith in play a plaintiff must first make a threshold showing of either a motivation for the Government employee in question to have acted in bad faith or conduct that is hard to explain absent bad faith." *Beta Analytics*, 61 Fed.Cl. at 226 (citation omitted); *see also DataMill, Inc. v. United States*, 91 Fed.Cl. 722, 730–31 (2010).[4]

■ A plaintiff seeking to supplement the record need not, for that purpose, meet the same burden of proof that it ultimately must carry on the merits, and "[t]he test for supplementation is whether there are sufficient well-grounded allegations of bias to support" supplementation. *Pitney Bowes Gov't Solutions, Inc. v. United States*, 93 Fed.Cl. 327, 332 (2010) (citing *L–3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed.Cl. 347, 354–55 (2010)). These allegations must rest on "hard facts," not merely innuendo or suspicion. *See Int'l Res. Recovery, Inc. v. United States*, 61 Fed.Cl. 38, 43 (2004); *Beta Analytics*, 61 Fed.Cl. at 226. The Court concludes that this is one of those rare cases in which "the proffered extra-record material . . . indicate[s] some personal animus or bias on the part of agency officials," *Madison Servs., Inc. v. United States*, 92 Fed.Cl. 120, 130 (2010), based on the hard facts of eyewitness (and earwitness) testimony. Plaintiff bases its case, at least in part, on the hostility of the facility manager towards it. The declarations it seeks to add to the record, to some degree or another,[5] contain the testimony of people who believe they have witnessed the facility manager either claiming that Tech Systems was going to lose

3. Our Court has recognized that adding this category of information "might be viewed as not supplementation at all, but merely requiring that the administrative record be complete." *Murakami v. United States*, 46 Fed.Cl. 731, 735 n. 4 (2000), *aff'd*, 398 F.3d 1342 (Fed.Cir.2005).

4. When discovery is sought, a second hurdle must be surmounted, and "the plaintiff must persuade the Court that discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regu-

larity and good faith." *Beta Analytics*, 61 Fed.Cl. at 226 (citing *Orion Int'l*, 60 Fed.Cl. at 343 n. 11, 344).

5. To the extent any of the declarations contain material that is objectionable as hearsay or otherwise, *see* Def.'s Resp. at 13–14, the government may of course object to its consideration. *See Global Computer Enters., Inc. v. United States*, 88 Fed.Cl. 52, 63–64, 69–70 (2009). Such objections will be considered in reviewing the merits of the case.

the competition or that CHC was going to win the competition, or acting in a manner to vex the Tech Systems employees or to assist CHC. At least so far as the question is animus toward plaintiff, no innuendo is necessary.

The government opposes supplementation, arguing that the facility manager "played *no role whatsoever* in the source selection decision." Def.'s Resp. to Pl.'s Mot. ("Def.'s Resp.") at 6. Defendant points out that the former COTR had very minor involvement in the procurement—merely filing the requisition form, assisting in market research, and advising on the amendment of a section of the Performance Work Statement. *Id.* (citing Admin. R. at 3, 5, 228). Solely for the purpose of opposing the supplementation, the government provides declarations from two of the technical evaluators, the past performance evaluator, the Contract Specialist, and CWO Samaniego himself. *See* Attachs. 1–5 to Def.'s Resp. The evaluators denied having any discussions or interactions with the former COTR during the evaluation process relating to the procurement, and claimed he had no influence on their decision. *See* Attach. 1 to *id.* ¶ 3; Attach. 3 to *id.* ¶ 3; Attach. 4 to *id.* ¶ 4. The Contract Specialist disputed plaintiff's employee's account of the Industry Day site visit, stating that the CHC owner did not meet with CWO Samaniego that morning, and was carrying a copy of the solicitation. Attach. 2 to Def.'s Resp. And while admitting to "some personality differences" with Tech Systems's tailor shop manager, CWO Samaniego denied involvement with the evaluation process, denied having any contact with CHC's owner concerning the solicitation or award, and denied several of the other allegations. *See* Attach. 5 to *id.*

The Court concludes, however, that these are all matters best left to the merits determination. It may well be the case that plaintiff will fail to prove a connection between

the facility manager's animus and the procurement decision. Perhaps the former COTR's statements were mere taunts, or were misunderstood by listeners. But this case presents the unusual circumstance in which an agency official is heard to make statements expressing a desire that one competitor lose a contract, and indicating that he had some information about or influence concerning the evaluation process. It might have been all bluster, but these statements set this case apart from those in which individuals were merely suspected of having been biased, rather than having allegedly broadcast that fact. *Cf. DataMill,* 91 Fed.Cl. at 731 (finding no motivation for personnel to have acted in bad faith nor conduct that is hard to explain absent bad faith); *Terry v. United States,* 96 Fed.Cl. 156, 160, 165 (2010) (lacking a comparable statement from official desiring plaintiff to lose, and with a record containing evidence expressly disclaiming that the official in question had any involvement in the award decision). Under these circumstances, in which a plaintiff alleges bad faith and bias on the part of an official who had at least some involvement in the procurement, and seeks to supplement the record with evidence of bias and bad faith allegedly coming from that official's own mouth, effective judicial review would be frustrated if the Court were not to allow the record to be supplemented.[6] Plaintiff's motion to supplement the administrative record is, accordingly, **GRANTED.**

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** plaintiff's motion to supplement the administrative record.

IT IS SO ORDERED.

---

**6.** Moreover, the Court notes that plaintiff has included claims for breach of the implied contract to fairly and honestly consider proposals. Compl. ¶¶ 61, 69. Before passage of the ADRA, such claims, resting on allegations of bad faith, were not confined to an administrative record. *See Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 155 (1997) (collecting cases). Since extra-record proof could have been the basis of these claims pre-ADRA, and the Federal Circuit recent-

ly found it "quite unlikely that Congress would intend that statute to deny a preexisting remedy without providing a remedy under the new statute," *Res. Conservation Group, LLC v. United States,* 597 F.3d 1238, 1246 (Fed.Cir.2010), if supplementation of the record were not allowed, the Court might still be required to consider the extra-record evidence in the context of the breach claims.